

FILED
U.S. DISTRICT COURT
INDIANAPOLIS DIVISION

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

2013 JUN -3 PM 2: 07

SOUTHERN DISTRICT
OF INDIANA
LAURA A. BRIGGS
CLERK

| | |
|---|---|
| CHAD R. TAYLOR, Derivatively on Behalf of Himself and All Others Similarly Situated, )<br><br>Plaintiff, )<br><br>vs. )<br><br>SARDAR BIGLARI, PHILLIP L. COOLEY, KENNETH R. COOPER, WILLIAM L. JOHNSON, JAMES P. MASTRIAN, and RUTH J. PERSON )<br><br>Defendants, )<br><br>-and- )<br><br>BIGLARI HOLDINGS, INC., )<br><br>Nominal Defendant. ) | Case No.:<br><br>1 : 1 3 -cv- 0 8 9 1 SEB -MJD |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
## DEMAND FOR JURY TRIAL

Plaintiff Chad R. Taylor, by and through his attorneys, brings this action derivatively on behalf of nominal defendant Biglari Holdings, Inc. ("BH" or the "Company") and alleges upon personal knowledge as to himself and his own acts, and as to all other matters based upon the investigation conducted by his attorneys which included, among other things, a review of Securities and Exchange Commission ("SEC") filings, documents, analyst reports, news reports, press releases, and other publicly available information regarding the Company, as follows:

## **INTRODUCTION**

1.      At BH's most recent annual shareholder meeting, Sardar Biglari ("Biglari"), the Company's founder and CEO touted, "I'm here to make everyone some damn money."

2.      Then, in a symbolic vote, the Company's shareholders overwhelmingly rejected the lavish compensation Biglari and the Company's Board of Directors (the "Board") had chosen to pay themselves during the previous year, with fewer than 30% of shares voting in favor. Such massive shareholder dissatisfaction with executive pay is highly unusual.[1] The negative shareholder vote is emblematic of a Company that has seen its performance stagnate as a result of a Board that has elected to concentrate its efforts on pushing through various measures to cement Biglari's control over the Company instead of focusing on maximizing shareholder value. Whereas some companies such as Warren Buffett's Berkshire Hathaway trade at a premium as a result of good corporate governance, BH shareholders suffer a Biglari penalty (causing returns to lag) due to the egregious actions he and the Board have taken to disenfranchise shareholders, outlined below.

3.      In recent months, Biglari and the Board entered into a licensing agreement whereby BH may use Biglari's name and likeness but must pay him an exorbitant 2.5% of gross revenues for five years after several "triggering events" including Biglari's ouster. Effectively Biglari has purported to make himself irremovable from his positions at the helm of BH. Further, Biglari has presented shareholders with a rights offering, whereby he claims to intend to

---

[1] According to Pension & Investments, a leading investment publication, in 2013 only 6 out of 333 major companies, including Biglari Holdings failed to have their executive compensation ratified by a majority of shareholders. *See* "Towers Watson: Shareholders Ratify Executive Compensation at 91% Clip" Pensions & Investments (May 1, 2013), at http://www.pionline.com/article/20130501/DAILYREG/130509986 (last visited May 8, 2013). In fact, the vast majority of companies saw a super-majority of shareholders ratify executive compensation. *Id.* ("Of the 333 companies so far in 2013, the vast majority saw more than 70% of votes cast in favor of their executive pay policies.").

present an opportunity for current shareholders to increase ownership. However, with Biglari's past history the likely driver behind the contemplated rights offering is for Biglari to increase his own voting control in order to further insulate his position at BH from any challenge.

4.      BH is a holding company whose primary operating assets are restaurant chains. BH currently serves as parent company to the Western Sizzlin and Steak n Shake restaurant chains. In August 2005, the Lion Fund LLC (the "Lion Fund"), a private investment partnership controlled by Biglari, began acquiring Western Sizzlin stock. By March 2006, Biglari was appointed Chairman of Western Sizzlin. He then utilized his influence over Western Sizzlin to have the company pursue a rights offering. The rights offering provided every shareholder with two transferable subscription rights for each share of common stock they owned. When independent shareholders, as expected, did not fully utilize the rights afforded to them, the rights offering essentially allowed Biglari to purchase additional shares in Western Sizzlin and solidify his control. Thus, by December of that same year, Biglari effectively took control of Western Sizzlin by having enough shares to force Western Sizzlin's seven existing directors to resign and replacing them with five new directors of his choice.

5.      In March 2007, Biglari set his sights on Steak n Shake. Seven months later, Biglari launched a proxy contest for control of the company. By June 2008, he had assumed control of the company and was named its Chairman and CEO. Next, Biglari set out to consolidate his acquisitions and further fortify his control.

6.      In August 2009, Biglari engineered a transaction under which Steak n Shake acquired Western Sizzlin for a modest 7% premium to the closing price on the day prior to the announcement of deal. Certain analysts following the transaction suggested self dealing was involved and that the transaction was overly generous to Biglari. Indeed, instead of seeing a

bump in the stock price as is normal upon announcement of a merger, Western Sizzlin's stock dropped by *1.7%* immediately following the announcement.

7.      Four months later, Biglari took his first steps towards entrenching his position at Steak n Shake.   In December 2009, Biglari implemented a 20 for 1 reverse stock split.[2]   The reverse split sent the price of Steak n Shake shares skyrocketing from $13 per share to $360 per share.   By increasing the trading price of the stock, Biglari squeezed out smaller investors and made it more difficult for investors seeking to implement changes at the Company to accumulate any significant block of shares.   The high price of a company's stock makes it unattractive to issue options, which are an essential tool that investors use to accumulate shares in a proxy contest.   Notably, according to Yahoo Finance, there are currently no options contracts outstanding for BH.

8.      Then, Biglari, comparing himself to "a painter doing his masterwork" changed Steak n Shake's name to Biglari Holdings, Inc. in April 2010.   The name change is emblematic of Biglari's dominance over the Company.

9.      What Biglari did next is even more illustrative of Biglari's influence over the Company.   Biglari engineered BH's acquisition of Biglari Capital Corporation ("Biglari Capital"), the general partner of the Lion Fund.   The acquisition was contingent on the approval of an executive compensation package for Biglari under which he would (as initially proposed) receive an annual salary of $900,000 plus an incentive bonus of 25% Steak n Shake's book value if Steak n Shake exceeded a 5% annual book value hurdle.   The compensation arrangement would apply retroactively and directly contradicted the pitch Biglari made to Steak n Shake's

---

[2] A reverse stock split is a process by which a company issues a smaller number of new shares in proportion to each of its shareholders' original shares, and then cancels shareholders' original shares.   The reduction in the number of issued shares is accompanied by a proportional increase in the share price.

shareholders when he originally sought their support for board seats. An editorial in the Indiana Business Journal accurately described the plan as a bait and switch:

> it wasn't long ago that Mr. Biglari sang a different tune on compensation to win the hearts of Steak n Shake shareholders and gain a seat on the company's Board. The proposed compensation arrangement, applied retroactively to prior Steak n Shake management would increase the rewards, Mr. Biglari claimed, at the time, were *excessive in light of management's poor performance and value destruction.*

(emphasis added).

8.      An article on Seekingalpha.com called the compensation plan "ridiculous" and "askew." The market reacted negatively to the announcement of the pay package and Steak n Shake's stock plummeted 26%.

9.      Biglari utilized the stock drop to his benefit, thereby increasing his control over the Company. He arranged for BH to invest approximately $35.7 million in the Lion Fund. The Lion Fund then used this money to purchase additional shares of BH on the cheap.

10.     Typically when a company repurchases its own shares, the stock is retired and loses voting rights. But here, retiring shares would defeat Biglari's personal purpose of exercising unchallengable control over the Company. Accordingly, Biglari utilized the incestuous relationship between BH and the Lion Fund to inappropriately increase his control over the Company and ensure that his pay package was approved. Thus it was not surprising when, on November 5, 2010, the Board approved an executive compensation package for Mr. Biglari that raised his salary to $900,000 and provided him with the opportunity to earn an additional $10 million each year that the book value of the Company increases by 6%. Additionally, the new package provided that if Mr. Biglari is terminated by the Company without cause or resigns for good reason, he will be entitled to receive a severance payment equal to

*299%* of the average annual cash compensation (consisting of his base salary and incentive compensation) paid to him since the date of the package was entered.

11.    Next, in April 2011, Biglari proposed recapitalizing the Company through the creation of a dual class share structure. The Company planned to designate all existing common stock as Class A shares and issue ten Class B shares through a pro-rata dividend for each Class A share outstanding. Class B shares were to be entitled to one-one hundredth of one vote per share and economic rights equivalent to one-fifth of Class A shares. In most cases, companies that use dual class share structures create them before an initial public offering, and do so to preserve the voting control with insiders. Dual class share structures are very difficult to unwind and make a third party acquisition of a company with such a structure nearly unfeasible. Luckily, BH shareholders saw through Biglari's ploy to buy voting control on the cheap and voted down the plan. However, Biglari is determined to use his substantial resources not to allow the Company's shareholders to thwart his aspirations for absolute control.

12.    Since Biglari's proposal to create a dual-class share structure has failed, the Company has preliminarily announced a rights offering (the "Offering"). Under the Offering, each BH shareholder will be entitled to receive one right per share they own. If the Offering is undersubscribed, shareholders would be entitled to purchase shares of common stock not purchased by other rights holders. Just as he did with Western Sizzlin, Biglari is utilizing the Offering to acquire a larger interest in the Company. Given the high trading price of the Company's shares due to the reverse stock split, it is unlikely that minority shareholders in the Company will participate in the Offering, which will allow Biglari to accumulate additional shares. The more control over the Company that Biglari gets, the more brazen he will be in utilizing its resources for his own personal gain.

- 6 -

13.     The licensing agreement he pushed through at the beginning of this year is a prime example of his incorrigible habit of putting his quest for personal gain above the Company's best interests.   Approximately two years after forcing through his pay package, Biglari compelled the Company to undertake its most damaging action to date.  On January 11, 2013, the Company announced that it had entered into a Trademark License Agreement (the "Licensing Agreement") with Biglari.  The Licensing Agreement granted BH an exclusive license to use the name and mark "Biglari."  The license under the Licensing Agreement is royalty-free unless a change of control occurs at the Company, Biglari is terminated without cause or Biglari resigns due to an involuntary termination event.  Upon the occurrence of one of these "triggering events" Biglari is entitled to receive a royalty from BH equal to *2.5%* of the Company's revenues for a specified period of no less than five years.

14.     Not only is the Licensing Agreement an egregious golden parachute that is separate and distinct from the golden parachute package that Biglari put in place during the acquisition of Biglari Capital discussed above, but it is also a surreptitious entrenchment device designed to further strengthen Biglari's control over the Company.   In reality, the Licensing Agreement is a device that will discourage potential suitors by making an acquisition of BH more costly.  Additionally, the loss of 2.5% of revenues at a company whose  Net Income Margin is a mere 2.74% could be devastating and throw the Company into the red.  Thus, as a result of the Licensing Agreement, the Board cannot remove Biglari from his position or create a situation where he may resign without risking the Company's demise.

15.     Each action Biglari has taken must not be viewed in a vacuum.  The ***combination of*** Biglari improperly funneling funds from the Company through the Lion Fund to repurchase shares of BH, the Licensing Agreement, the Offering as well as the other conduct complained of

herein represents Biglari and the Board's decisions to entrench their positions within BH and ensure that it is unreasonably difficult for any shareholder who disagrees with their self-serving policies to wrest such control.

16.     Biglari and his Board have taken every opportunity to enrich themselves at the Company's expense, consistently rewarding themselves and further establishing their positions within the Company. Instead of seeking out qualified *independent* candidates for Board and officer positions, Biglari has ensured that BH Board members are his long-time friends and associates, incapable of refusing his self-interested agenda.

17.     This is a shareholder derivative action brought on behalf of the Company. The complaint seeks relief against the BH Board – Defendants Sardar Biglari (BH's Chief Executive Officer ("CEO") and Chairman), Phillip L. Cooley (BH's Vice Chairman of the Board), Kenneth R. Cooper, William L. Johnson, James P. Mastrian, and Ruth J. Person (collectively "Defendants" or "Individual Defendants") to remedy their breaches of fiduciary duties.

18.     By this complaint, Plaintiff seeks to hold Defendants liable for depriving shareholders their rights to democratically affect change within the Company, which has caused BH to suffer, and to further enjoin such conduct. Because Defendants committed the wrongdoing alleged herein, they cannot reasonably be expected to initiate litigation on the Company's behalf. In fact, this would require them to pursue litigation against themselves. Accordingly, Plaintiff Chad R. Taylor, as a non-controlling and independent shareholder of BH proceeding derivatively on behalf of the Company, is the proper party to prosecute this lawsuit.

## JURISDICTION AND VENUE

19.     This Court has jurisdiction pursuant to 28 U.S.C. §1332(a), as Plaintiff and Defendants are either citizens of different states or citizens of a state and citizens or subjects of a foreign state and the amount in controversy exceeds $75,000 exclusive of interests and costs. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

20.     This Court has jurisdiction over each defendant because each defendant is either a corporation that is incorporated in this District or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

21.     Venue is proper in this Court under 28 U.S.C. §1391(a) because: (1) Defendants are officers and directors of a the Company, which is incorporated within this District; (2) a substantial portion of the transactions and wrongs complained of herein occurred within this District, and (3) Defendants have engaged in numerous activities that have had an effect in this District.

## THE PARTIES

**Plaintiff Shareholder**

22.     Plaintiff Chad R. Taylor ("Plaintiff") is a current shareholder of BH and has been a shareholder of the Company continuously during all relevant times to the allegations of woringdoing alleged herein.  Plaintiff is a citizen of the State of California.

**Nominal Defendant BH**

23.     Nominal defendant BH is an Indiana Corporation with its executive offices located at 17802 IH 10 West, Suite 400 San Antonio, Texas and is thus a citizen of Indiana and

Texas. BH is a diversified holdings company with significant holdings in the restaurant industry. The Company's restaurant operations are conducted through two restaurant concepts, Steak n Shake and Western Sizzlin. According to the Company's SEC filings, its long-term objective is to maximize per-share intrinsic value. BH's stock is traded under the symbol "BH" on the New York Stock Exchange.

24. BH is named in this Complaint as a nominal defendant solely pursuant to principles regarding the joinder of indispensable parties, which provide for BH's joinder as a nominal defendant in whose name the suit is brought derivatively. Based on BH's response to Plaintiff's pre-suit demand for the inspection of books and records, and in light of Defendants control over BH, Plaintiff believes that BH's management are antagonistic to Taylor and the relief he seeks herein, and accordingly, it is treated as a defendant for diversity jurisdiction purposes.

**Individual Defendants**

25. Defendant Sardar Biglari has served as a director of the Company since June 2008 and its CEO since August 2008. He also previously served as a director of Western Sizzlin for several years with defendants Cooper and Cooley. All major operating, investment, and capital allocation decisions for BH are made by Biglari. Biglari has also served as Chairman and Chief Executive Officer of Biglari Capital, a wholly-owned subsidiary of BH and general partner of the Lion Fund, since its inception in 2000. He also has served as a director since December 2005, Chairman since March 2006, and Chief Executive officer and President since May 2007 of Western Sizzlin Corporation, a former NASDAQ company that was acquired by BH in March 2010. Biglari owns 15.5% of all outstanding BH shares either directly or through related companies controlled by him, which aids in his control over corporate matters.

26.     Biglari's investment approach has included alleged unlawful activity in connection with the acquisition of a block of shares in Cracker Barrel, which subjected the Company to an $850,000 fine by the Federal Trade Commission in September 2012 for violations of the Hart Scott Rodino Act.   *U.S. v. Biglari Holdings Inc.*, 1:12-cv-01586 (D.D.C.). As a Cracker Barrel spokesperson observed: "Our concerns about Mr. Biglari's intentions are underscored by the finding that Biglari Holdings violated the Hart-Scott-Rodino act in connection with its acquisition of Cracker Barrel stock."  *See* "Biglari Agrees to Antitrust Fine in Cracker Barrel Deal," Bloomberg (Sep. 25, 2012).

27.     Biglari owed a duty to the Company to take actions that were compliant with applicable legal standards and calculated to maximize the Company's value and that of its shareholders.  Rather than fulfill the fiduciary duties he owed to BH, Biglari actively participated in and caused or permitted the wrongful acts complained of herein and breached at least his fiduciary duties of candor, good faith, care, and loyalty to BH, as set forth in greater detail below.  Biglari is a citizen of the State of Texas.

28.     Defendant Phillip L. Cooley ("Cooley") has been a Director since March 2008 and Vice Chairman of the Board since April 2009 as well as chairman of its audit committee until September 2012.  He also previously served as a director of Western Sizzlin for several years with defendants Biglari and Cooper. Defendant Cooley has long standing ties to Biglari as he has served as an advisory director of Biglari Capital since 2000 and as Vice Chairman and a director of Western Sizzlin from 2006 and December 2005, respectively.  Before that time he was also Biglari's professor. Because of Defendant Cooley's experience and positions at BH, his access to internal corporate documents, conversations and connections with other corporate offices and employees, attendance at management and Board meetings and committees thereof

and via reports and other information provided to him in connection therewith, he is intimately familiar with the wrongs complained of herein. Rather than fulfill the fiduciary duties owed to BH, Defendant Cooley actively participated in and caused or permitted the wrongful acts complained of herein and breached at least his fiduciary duties of candor, good faith, care, and loyalty to BH, as set forth in greater detail below. Defendant Cooley is a citizen of the State of Texas.

29.     Defendant Kenneth R. Cooper ("Cooper") has been a Director of the Company since 2010. He also previously served as a director of Western Sizzlin for several years with defendants Biglari and Cooley. He also has invested in the Lion Fund. Defendant Cooper serves on the Company's audit and governance, compensation and nominating committees. Because of Defendant Coopers's experience and positions at BH, his access to internal corporate documents, conversations and connections with other corporate offices and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him in connection therewith, he is intimately familiar with the wrongs complained of herein. Rather than fulfill the fiduciary duties owed to BH, Defendant Cooper actively participated in and caused or permitted the wrongful acts complained of herein and breached at least his fiduciary duties of candor, good faith, care, and loyalty to BH, as set forth in greater detail below. Defendant Cooper is a citizen of the State of Texas.

30.     Defendant Dr. Ruth J. Person ("Person") has been a Director of the Company since 2002. Defendant Person serves on the Company's audit and governance, compensation and nominating committees. Because of Defendant Person's experience and positions at BH, her access to internal corporate documents, conversations and connections with other corporate offices and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to her in connection therewith, she is intimately familiar with the wrongs complained of herein. Rather than fulfill the fiduciary duties she owed to BH, Defendant Person actively participated in and caused or permitted the wrongful acts

- 12 -

complained of herein and breached at least his fiduciary duties of candor, good faith, care, and loyalty to BH, as set forth in greater detail below. Defendant Person is a citizen of the State of Michigan.

31.    Defendant William L. Johnson ("Johnson") has been a Director of the Company since February 2012. Defendant Johnson serves on the Company's audit and governance, compensation and nominating committees. Because of Defendant Johnson's experience and positions at BH, his access to internal corporate documents, conversations and connections with other corporate offices and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him in connection therewith, he is intimately familiar with the wrongs complained of herein. Rather than fulfill the fiduciary duties owed to BH, Defendant Johnson actively participated in and caused or permitted the wrongful acts complained of herein and breached at least his fiduciary duties of candor, good faith, care, and loyalty to BH, as set forth in greater detail below. Defendant Johnson is a citizen of the State of Michigan.

32.    Defendant James P. Mastrian ("Mastrian") has been a Director of the Company since August 2012. Defendant Mastrian serves on the Company's audit and governance, compensation and nominating committees. Because of Defendant Mastrian's experience and positions at BH, his access to internal corporate documents, conversations and connections with other corporate offices and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him in connection therewith, he is intimately familiar with the wrongs complained of herein. Rather than fulfill the fiduciary duties owed to BH, Defendant Mastrian actively participated in and caused or permitted the wrongful acts complained of herein and breached at least his fiduciary duties of candor, good faith, care, and loyalty to BH, as set forth in greater detail below. Defendant Mastrian is a citizen of the State of Texas.

## DUTIES OF THE INDIVIDUAL DEFENDANTS

33.     By reason of their positions as officers and directors of the Company, and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company the fiduciary obligations of good faith, trust, loyalty, and due care, and were, and are, required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner.  The Individual Defendants were, and are, required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

34.     Each director and officer of the Company owes to BH the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

35.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of BH, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.  Because of their executive, managerial and directorial positions with BH, each of the Individual Defendants had access to adverse, non-public information about the unlawful conduct alleged herein.

36.     At all times relevant hereto, each of the Individual Defendants was the agent of the other Individual Defendants and of BH, and was at all times acting within the course and scope of such agency.

37.     To discharge their duties, the officers and directors of BH were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of BH were required to, among other things:

          a.     manage, conduct, supervise and direct the business affairs of BH in accordance with all applicable laws;

- 14 -

b.     establish and maintain systematic and accurate records and reports of the business and affairs of BH and procedures for the reporting of the business and affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

c.     neither engage in self-dealing nor knowingly permit any officer, director or employee of BH to engage in self-dealing;

d.     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

e.     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock; and

f.     remain informed of how BH conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws.

38.     Each Individual Defendant, by virtue of his or her position as a director and officer, owed to the Company the fiduciary duties of loyalty, good faith, the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants alleged herein involves a violation of their obligations as directors and officers of BH, the absence of good faith on their part and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware, or should have been aware, posed a risk of serious injury to the Company. The conduct of the Individual Defendants, who were also officers and/or directors of the Company, has been ratified by the remaining Individual Defendants who collectively comprised BH's Board.

- 15 -

39.    The Individual Defendants breached their duties of loyalty and good faith by allowing Defendant Biglari to take self-interested and entrenching actions, without regard to legal norms, as set forth herein.

40.    Additionally, BH has adopted a Corporate Governance Guidelines which provide in relevant part that:

> The Board of Directors (the "Board") of Biglari Holdings Inc. (the "Company") has adopted the following guidelines to promote the effective governance of the Company. The Board will also review and amend these guidelines as it deems necessary or appropriate.
>
> On behalf of the Company's shareholder's, the Board is responsible for overseeing the management of the business and affairs of the Company.

41.    The Company's Corporate Governance Guidelines further provide that the "basic responsibilities of the [Company's] directors is to exercise their business judgment to act in what they reasonably believe to be in the best interest of the Company and its shareholders, and to conduct themselves in accordance with their duties of care and loyalty."

42.    BH has also established a Code of Ethics (the "Code") that applies to all directors, officers and employees of BH, as well as its subsidiaries. The purpose of the Code was to "uphold the highest level of ethics and personal integrity." The Code in relevant part provides:

### III. Ethical Standards

#### A. Compliance with Applicable Law

Compliance with the law is essential to the Company's ethical obligations. Covered Persons must obey the laws of the United States and of the states, counties and cities in which the Company conducts business. While a Covered Person may not know the details of every rule and regulation to which the Company's activities are subject, all such persons should know enough about the applicable law to know when to seek the help of a supervisor or the Company's legal counsel.

#### B. Fair Dealing

Covered Persons shall act honestly and ethically at all times. They shall act in good faith, with due care, and shall engage only in fair and open competition.

All competitors, suppliers, customers, colleagues, and coworkers shall be treated ethically. Stealing proprietary information, possessing unauthorized trade secrets, or soliciting disclosure of such information from past or present employees of other companies is strictly forbidden. Covered Persons shall not take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts, or any other unfair practice.

* * *

### D. Corporate Opportunities

No Covered Person may: (a) take for himself or herself personally or for an entity in which he or she has any interest, opportunities that are discovered through the use of Company property, information, position or employment without the consent of the Board of Directors of the Company; (b) use Company property, information or position for personal gain or for the benefit of an entity in which he or she has any interest; or (c) compete with the Company directly or indirectly either personally or through the use of any entity in which he or she has any interest while employed with the Company and for any legally enforceable period agreed to in writing by the Covered Person and the Company. Covered Persons owe a duty to the Company to advance the Company's legitimate business interests when the opportunity presents itself.

* * *

### G. Protection and Use of Company Assets

The Company's assets should be protected and efficiently used by all Covered Persons. Corporate waste and theft have a direct impact on the Company's bottom line. A Covered Person shall immediately report any incident of fraud or theft. In addition, Company assets should not be used for non-Company business, though incidental personal use may be permitted.

### H. Conflicts of Interest

A "conflict of interest" exists when the private interests of a Covered Person interfere –or even appear to interfere – in any way with the Company's interests. For example, conflict of interest situations can arise when a Covered Person takes actions or has interests that may make it difficult to perform his or her Company work objectively and effectively. Conflicts of interest may also arise when a Covered Person, or a member of his or her family receives improper personal benefits as a result of his or her position with the Company. Loans to, or guarantees of obligations of Covered Persons and their family members may create conflicts of interest. It is almost always a conflict of interest for a Covered Person to work simultaneously for a competitor, customer or supplier. The existence of a conflict depends upon the circumstances, including the nature

and relative importance of the interest involved. Conflicts of interest may not always be easy to spot, so if there is ever a question as to whether a given situation presents a conflict of interest, you should consult with your supervisor or manager. In appropriate situations, you may even wish to contact, the chief financial officer or chief legal officer of the Company. Any Covered Person who becomes aware of a conflict of interest (whether potential or existing conflict) should bring it to the attention of a supervisor, manager or other appropriate personnel or consult the procedures described in Section IV of this Code.

Any director or executive officer of the Company shall alert the CEO to any material transaction or relationship that may reasonably lead to the existence of a conflict of interest. No action may be taken with respect to such transaction or party unless and until such action has been approved by the Audit Committee.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

43.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with, and conspired with, one another in furtherance of their common plan or design. In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breach of their respective duties.

44.     In furtherance of this plan, conspiracy and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

45.     The Individual Defendants engaged in a conspiracy, common enterprise and/or common course of conduct that caused the Company to conceal the true facts that BH was misrepresenting the adequacy of its internal controls and violating applicable laws.

46.     During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to and did:

        a.      Conceal the fact that the Company was allowing Individual Defendants to entrench themselves in the Company to the Company's detriment; and

b.      Deceive the investing public, including shareholders of BH, regarding the Individual Defendants' management of BH's operations.

47.      Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## SUBSTANTIVE ALLEGATIONS

### A Brief History of BH and Its Predecessors Western Sizzlin and Steak n Shake

48.      In 2000, Biglari took the proceeds of the sale of a previous venture and founded Biglari Capital, general partner of the Lion Fund, L.P.  Biglari named his former professor and longtime business partner, Defendant Cooley as an advisory director to Biglari Capital, a position Defendant Cooley retains to present date.  The Lion Fund investments fell into three broad categories: generals, specials, and controls.  Generals were passive stakes in undervalued companies with "sustainable competitive advantages under able and honest management."  Specials were arbitrage of other unconventional investments and were generally uncorrelated with the stock market.  Controls were stakes in companies whereby Biglari sought to take an active role in.  Five years after its formation, The Lion Fund would embark on its first control investment.

### Western Sizzlin

49.      Western Sizzlin was founded in Augusta, Georgia, in 1962 and soon became a successful steakhouse chain with more than 600 restaurants.  However, by 2005 the Western

Sizzlin brand had faded. Biglari saw an opportunity to revive the chain and by August 2, 2005 Biglari disclosed that he had acquired an 11.36% ownership position in Western Sizzlin. Biglari continued to acquire shares in the company and by November 2005 he had acquired a large enough block to appoint himself, Defendant Cooley and Paul D. Sonkin to the Western Sizzlin board. Biglari continued to acquire shares of Western Sizzlin and in March 2006, he forced six of the incumbent directors out appointed himself Chairman of its board with Defendant Cooley as its vice chairman.

50.     By October 2006, Biglari, along with three other stockholders, owned approximately 43% of Western Sizzlin's stock. Authority for all investment and major capital allocation decisions had been given to Biglari. In an SEC disclosure, Western Sizzlin cautioned investors that "[T]here is a risk in having concentrated decision-making authority. Mr. Biglari's decisions could either independently or in the aggregate involves amounts that are material to our business... he is singularly responsible for these decisions." Biglari's self serving course of conduct enabled him to entrench himself on the Western Sizzlin board, which enabled him to secure enough control to compel the company to undertake a rights offering.

51.     Pursuant to the rights offering, for each share of common stock that Western Sizzlin owned, and/or per every two rights that they owned, Western Sizzlin shareholders were entitled to subscribe for one common share. The subscription price was set at $7.00 per whole share. The subscription rights were transferable, enabling shareholders who did not want to exercise their rights to sell their rights to other shareholders who did want to exercise their rights to sell. The rights offering provided two benefits for Biglari, first it allowed him to raise capital for future investments and, secondly, it enabled him to acquire additional shares of the company and further cement his control.

**Steak n Shake**

52.     After initiating a quest to acquire shares of Steak n Shake in spring 2007, Biglari disclosed a 5.8% ownership in the company on August 17, 2007. Just four days earlier, Biglari

and Defendant Cooley had traveled to Steak n Shake's headquarters to meet with its Chairman of the Board and senior management. At the time, Biglari was the company's third largest shareholder and he had hoped to obtain two seats on the board. However, Biglari was denied representation and otherwise rebuffed from any involvement with the company.

53. Two months later, Biglari launched a proxy contest for two board seats of Steak n Shake. He wrote to the company shareholders that he was:

> ...disturbed by the present direction of The Steak n Shake Company as exemplified by its failed vision, failed strategy, failed execution, and failed board. The amalgam of poor corporate governance, lack of strategic direction, and deteriorating operating and financial performance has led to dismal shareholder returns.

54. On March 7, 2008, after an acrimonious fight between Biglari and the existing board of Steak n Shake, 74% of Steak n Shake shareholders voted to place Biglari and Defendant Cooley on the company's board. The shareholders of Steak n Shake rebelled against Steak n Shake's management in the hope of correcting poor corporate governance that had led to the company's dismal performance. However, they did not realize that by voting in Biglari, very little would change for the better, and by voting in Biglari and his colleague, the corporate governance would further deteriorate.

55. In June 2008, Biglari was named Chairman of Steak n Shake. Two months later he was named the company's Chief Executive Officer. Just as he had done with Western Sizzlin, Biglari sought to entrench himself on the board and take complete control of the company. Approximately one year after being appointed Chairman, Biglari took extraordinary measures to seize control. In a February 8, 2010 article entitled *Steak n Shake Moving HQ* discussing the matter, the Indiana Business Journal observed:

> Biglari in June persuaded the board to transform Steak n Shake into a holding company for a diverse range of investments and give Biglari sole discretion over asset allocation. ***The board's vote essentially allowed the hedge-fund owner to use the publicly traded company as a personal investment vehicle.***

The unanimous vote came after Biglari, the board chairman, *managed to push out every board member unwilling to give him dictatorial authority over Steak n Shake despite his relatively modest ownership stake.* Biglari personally owns about 7 percent of the shares in Steak n Shake and controls another 5 percent through his Lion Fund.

The board now has five members, including Biglari, down from nine. Now that the board has given Biglari sole authority over all investments, the question is, who holds Biglari accountable?

(Emphasis supplied).

56.    The former interim CEO of Steak n Shake, Wayne Kelley, was one of the members of the board discussed in the article above who resigned his position with the company. In his resignation letter Kelley stated in relevant part:

Over the last several months, I have thought about the wisdom of remaining on the board of directors of The Steak n Shake Company a number of times. Obviously, I have very strong feelings for the company and its iconic brands. However, as time has gone on, I have felt that my contributions, as well as those of other board members, have not been welcomed or appreciated. *I have also thought that the advice of board members has not been sought, either before or after major decisions affecting the company.* In my various corporate experiences over the years that I have been involved in business, both as an officer and as CEO, Chairman and/or a board member, I have expected (either as a participant or as the person more in control) that there would be an active interaction between the leaders of a company's management and its board of directors. There was to be a partnership in developing and monitoring the company's vision and goals. Unfortunately, I do not find that to be the case with the current situation at The Steak n Shake Company.

In my opinion, the current leadership of the Steak n Shake Company is less interested in the company and the brand than in the leadership itself. *I also believe that although our current chairman and CEO espoused openness and transparency, the opposite has been the case. The board has not been actively involved in developing the vision and strategy of the business, but rather has been informed about it belatedly. This is a public company; it is not a company that is controlled by one or a few individuals.* It would seem that the best way to proceed would be to solicit informed opinions, even if they were not consistent with the person or people in charge.

(Emphasis supplied)

57.     As a result of his efforts, Biglari was granted "full power and authority to make all investment and capital allocation decisions on behalf of the company." As the Indiana Business Journal noted, this was "a highly unusual move for a public company".

58.     Not surprisingly, after seizing control, Biglari had the board increase his executive compensation. According to a filing on Form 8-K with the SEC, Biglari's pay was raised to $900,000.

59.     Then, in July 2009, according to the Indiana Business Journal, the Company's directors gave Biglari "*an even longer leash*. Regulatory filings show that in July, the board negotiated its lending agreement with Fifth Third Bank to give the company the leeway to use up to $10 million in surplus cash 'to make investments of any lawful nature.'" (Emphasis supplied).

60.     As Biglari amassed control over Steak n Shake, it started to become apparent that Biglari had forgotten the 2008 protestations he made to the company's shareholders during his mission to gain a seat on the board about bringing better corporate governance to Steak n' Shake. The Indiana Business Journal stated "[Biglari] doesn't seem like such a champion of transparency these days. Since he took the reins last year, the company has been increasingly uncommunicative, even as he has amassed more and more power."

## Steak n Shake Acquires Western Sizzlin

61.     With Steak n Shake firmly within his grasp, Biglari next set out to consolidate his various investments. On August 13, 2009, Steak n Shake announced a deal to buy Western Sizzlin for $23 million. The Joint Press release announcing the acquisition stated in relevant part:

> The Letter of Intent contemplates that on or prior to closing Western will distribute to its stockholders all of the SNS shares beneficially owned by Western. Further, under the terms of the Letter of Intent, the consideration payable to Western's stockholders will be based on a net transaction valuation of approximately $22,959,000.00. At closing, each share of Western's common stock would be converted into the right to receive an amount equal to approximately $8.11 in the principal amount of debentures issued by SNS. It is

anticipated that the SNS debentures will have a term of five (5) years, will bear interest at the rate of 14 percent per annum and will be pre-payable without penalty at the option of SNS after one (1) year from the date of issuance.

62.     Biglari structured the merger in an unusual manner under which Steak n Shake would pay the bulk of the consideration by issuing bonds to Western Sizzlin shareholders. The SEC filings regarding the sale of Western Sizzlin indicate the special committees established to consider the deal were reluctant to pursue the unusual structure. However, given that Biglari dominated the boards of both Steak n Shake and Western Sizzlin, his desired structured was pushed through. According to the Indiana Business Journal, "[t]he decision to issue bonds, the approach championed by Biglari, will generate a steady stream of interest income for him and his investment group."

63.     Western Sizzlin was acquired for a mere 7% premium to the closing price on the day prior to the announcement of deal. Instead of seeing a bump in the stock price that is normal when a merger is announced, Western Sizzlin's stock dropped by *1.7%*. Many in the market criticized the transaction. In an August 2009 report, Michael Gallo, an analyst with CL King, wrote:

> At first glance, there seems to us to be some self-dealing regarding the transaction…Given the apparent progress toward stabilizing [Steak n Shake] over the last couple of quarters, *this transaction makes no sense to us.*

(Emphasis supplied).

### Steak n Shake 20-1 Reverse Split

64.     Four months after announcing it would acquire Western Sizzlin, Steak n Shake disclosed that it planned to initiate a 20 for 1 reverse stock split that would reduce its number of shares outstanding from almost 29 million to just 1.4 million and boost its per-share price from roughly $12 per share to $240 per share. Reverse splits can be utilized for legitimate purposes – for example, struggling companies may use them to maintain a share price above a $1, however, a reverse split can also be used to freeze out minority holders. Additionally, a reverse split may have the effect of making it more difficult to challenge the current management of a company.

Shareholders who seek to replace board members or wage a proxy contest often utilize options to gain ownership interest in a company. The effect of a reverse split can be to raise the price of a company's shares to the point where options are no longer written. Notably, there are no current open options for BH. The Indiana Business Journal criticized the reverse split at Shake n Shake in a December 15, 2009 article entitled *Steak n Shake Plans 20-1 Reverse Stock* Split writing:

> Biglari has transformed Steak n Shake into a holding company, ala Buffett's Berkshire Hathaway, and has announced plans to use the chain's free cash flow to make acquisitions as he pleases. Steak n Shake agreed in August to acquire the steak chain Western Sizzlin, another Biglari holding, and has acquired a roughly 10-percent stake in a small insurer.
>
> ***Now, Biglari hopes to scare off short-term investors by raising the share price of Steak n Shake.*** (Buffett has famously refused to split shares in his Berkshire Hathaway A stock, which now trades for $99,400 a share, although the B shares are available for 1/30th of the cost.)

(Emphasis supplied).

65.     Given Biglari's history, the reverse split was clearly a ploy to further his entrenchment at Steak n Shake. His next move was even more audacious. In January 2010, Steak n Shake announced plans to change its corporate name to Biglari Holdings Inc. and reserved the trading symbol BH.

**Biglari Holdings, Inc.**

66.     On April 8, 2010, the Company filed Articles of Amended and Restated Articles of Incorporation with the Secretary of State of Indiana changing the Company's name from The Steak n Shake Company to Biglari Holdings Inc. According to a *Seeking Alpha* article, critics felt the name change was an "arrogant act" but Biglari "defended the name change by comparing himself to 'a painter doing his masterwork. An artist, after all signs his work.'" Continuing with his "masterwork" Biglari's next step was to further consolidate his investments.

67.    On April 30, 2010, BH in a Form 8-K filed with the SEC announced the
acquisition of Biglari Capital Corporation, the general partner of the Lion Fund. The Form 8-K
stated in relevant part:

> On April 30, 2010, Biglari Holdings Inc., an Indiana corporation (the
> "Company"), acquired Biglari Capital Corp., a Texas corporation ("Biglari
> Capital"), pursuant to a Stock Purchase Agreement, dated April 30, 2010 (the
> "Stock Purchase Agreement"), between the Company and Sardar
> Biglari. Biglari Capital is the general partner of The Lion Fund, L.P., a
> Delaware limited partnership that operates as a private investment fund (the
> "Lion Fund").
>
> Pursuant to the Stock Purchase Agreement, Mr. Biglari sold all of the shares of
> Biglari Capital to the Company for a purchase price of $1.00 plus (i) an amount
> equal to Biglari Capital's adjusted capital balance, if any, in its capacity as
> general partner of the Lion Fund, and (ii) an amount equal to the total incentive
> reallocation allocable to Biglari Capital for the period from January 1, 2010
> through April 30, 2010, less any distributions in respect of such amounts
> previously received by Mr. Biglari. The payments set forth in clauses (i) and
> (ii) above represent solely those amounts that have accrued to date to Biglari
> Capital, as general partner of the Lion Fund, estimated at closing to be $4.175
> million. The Stock Purchase Agreement contains customary representations,
> warranties and indemnities.
>
> The Stock Purchase Agreement provides that the Company will prepare and file
> with the Securities and Exchange Commission proxy materials for a special
> meeting of its shareholders at which it will submit the Incentive Bonus
> Agreement (as defined below) for approval by its shareholders for purposes of
> Section 162(m) under the Internal Revenue Code of 1986, as amended (the
> "Code"), in order to preserve the tax deductibility to the Company of the
> performance-based compensation payable to Mr. Biglari under such
> agreement. If the Incentive Bonus Agreement is not approved by the
> Company's shareholders, Mr. Biglari will have the option, exercisable within 30
> days after the special meeting, to repurchase Biglari Capital for a purchase price
> equal to the sum of (i) $1.00, (ii) an amount equal to Biglari Capital's adjusted
> capital balance, if any, in its capacity as general partner of the Lion Fund, and
> (iii) an amount equal to the total incentive reallocation allocable to Biglari
> Capital for the period from April 30, 2010 through the repurchase date, less any
> distributions in respect of such amounts previously received by the Company.

68.    Essentially, BH would acquire Biglari Capital for $1 plus an amount equal to
Biglari's capital base, estimated to be $4.75 million. The buyout was contingent upon

shareholder approval of a new compensation package for Biglari consisting of a $900,000 annual salary as well as the opportunity to receive annual incentive compensation payments based on the company's book value growth each fiscal year. If the Company exceeded a 5% annual book value growth hurdle, Biglari would receive an incentive bonus payment of 25% of the Company's book value in excess of the hurdle. Investor reaction was overwhelmingly negative to the compensation plan. A message board poster wrote "Big Liar should be fired" and a Motley Fool columnist wrote "Bigliari is showing just how far management can go to rip off shareholders." Discussing the compensation package, a May 17, 2010 article in the Indiana Business Journal, entitled *Behind The News: Unorthodox Pay Package Puts Biglari on Defensive*, stated in relevant part:

> Through it all, he's cast himself as a champion of shareholders. And he's trashed the legions of American companies that pay their management richly even for rotten performance.
>
> But the ***new plan is spurring howls of hypocrisy***. On April 30, Biglari Holdings announced it bought the general partner of Sardar Biglari's San Antonio-based hedge fund for the value of its assets. And in the same regulatory filing,
>
> Biglari Holdings said it would begin paying Sardar 25 percent of any increase in the company's annual bookvalue growth topping 5 percent.
>
> The Motley Fool columnist, Richard Gibbons, called it "***one of the sweetest compensation arrangements*** I've ever seen at a public company"-one that would cut deeply into shareholder returns.
>
> In the exotic world of private hedge funds, where wealthy investors pay huge sums in hopes of landing staggering returns, the formula probably wouldn't raise many eyebrows. But critics say it's overly rich in the public company realm. And they say it sets the performance bar too low.
>
> Boosting book value 5 percent is "unexceptional," said Ken Skarbeck, managing partner of Aldebaran Capital and a columnist for IBJ. "***To pay a bonus on top of that is excessive.***" He noted that the pay is in addition to the $900,000 annual salary Biglari receives.

(Emphasis supplied).

69.    Negative reaction to the compensation program caused BH's shares to plummet, with the stock dropping approximately 26% over the ensuing months. Biglari utilized the stock drop to acquire greater control of the Company. He responded by purchasing large blocks of the Company's stock through the Lion Fund. When funds were depleted at the Lion Fund he then arranged for BH to invest approximately *$35.7 million* in the Lion Fund which was then used to purchase additional shares in BH. An Indiana Business Journal article stated "one large Biglari Holdings shareholder believes Biglari is snapping up more shares to ensure he can garner enough votes to approve his pay package, after major investors protested." What is clear is that typically when a public company repurchases its shares it retires them. This was not the case with the shares that the Lion Fund purchased using BH's investment. Biglari ensured these shares maintained their voting rights.

70.    Unsurprisingly, on November 5, 2010, the compensation program for Biglari was approved, albeit slightly modified. Under the compensation plan put in place, Biglari would receive a salary of $900,000 in addition to being entitled to up to an additional $10 million each year book value of the Company increases by 6%. Additionally, the new package provided that if Biglari is terminated by the Company without cause or resigns for good reason he will be entitled to receive a severance payment equal to *299%* of the average annual cash compensation (consisting of his base salary and incentive compensation) paid to him since the date of the compensation program if there was a change in control at the Company, Biglari was terminated without cause or he resigns for good reason. Through the compensation program Biglari had secured for himself a healthy golden parachute in the unlikely event that he loses control over the Company. A little over two years later, under the guise of an additional golden parachute package, Biglari put in place an entrenchment mechanism that would ensure he could never lose control of the Company.

**Biglari's Licensing Agreement**

71.     On January 11, 2013 the Company filed a Form 8-K with the SEC announcing the

Licensing Agreement with Biglari.  The 8-K stated in relevant part:

> On January 11, 2013, Biglari Holdings Inc. (the "Company" or "Licensee")
> entered into a Trademark License Agreement (the "Agreement") with Sardar
> Biglari, Chairman and Chief Executive Officer of the Company
> ("Licensor"). The Agreement was unanimously approved by the Governance,
> Compensation and Nominating Committee of the Board of Directors of the
> Company.
>
> Under the Agreement, Licensor granted to Licensee an exclusive license to use
> the name and mark Biglari (alone or in connection with other terms and/or
> designs) (the "Licensed Marks") in association with the provision of investment
> services, franchising services, financial services, restaurant franchising
> (including business management assistance in the establishment and/or
> operating of restaurants), hospitality services, hotel management services,
> insurance services, restaurant services, retail and retail related services, real
> estate services and apparel (collectively, the "Products" and the "Services")
> throughout the world. Upon (a) the expiration of twenty years from the date of
> the Agreement (subject to extension as provided in the Agreement), (b) the
> death of Licensor, (c) the termination of Licensor's employment by Licensee for
> Cause (as defined in the Agreement), or (d) Licensor's resignation from his
> employment with Licensee absent an Involuntary Termination Event (as defined
> in the License Agreement), the Licensed Marks for the Products and Services
> will transfer from Licensor to Licensee without any compensation if Licensee is
> continuing to use the Licensed Marks in the ordinary course of its business;
> otherwise, the rights will revert to Licensor.
>
> The license provided under the Agreement is royalty-free unless and until one of
> the following events occurs: (i) a Change of Control (as defined in the
> Agreement) of Licensee; (ii) the termination of Licensor's employment by
> Licensee without Cause; or (iii) Licensor's resignation from his employment
> with Licensee due to an Involuntary Termination Event (each, a "Triggering
> Event"). Upon the occurrence of a Triggering Event and for a specified period
> of no less than five years thereafter, Licensor will be entitled to receive a royalty
> from Licensee equal to two and one-half percent of revenues received by
> Licensee, its subsidiaries and affiliates from Products, Services and businesses
> associated with a Licensed Mark prior to or following the Triggering Event, as
> specifically provided in the Agreement.

72.     Under the Agreement, BH can use Biglari's name and mark for 20 years and does

not have to pay royalties unless Biglari's employment is terminated without cause, there's a

change in control at the company, or an "involuntary termination event" occurs.[3] If one of these circumstances occurs, Biglari is entitled to 2.5% of BH's revenue for at least five years. Based upon the Company's 2012 revenue Biglari would be entitled to approximately *$18.35 million.* In addition to the monies he is entitled to as a result of the golden parachute package that was put in place in November 2010. To understand the magnitude of the impact of such a payment to Biglari, the Company's operating income in 2012 was only $38.82 million and its net income available to common shareholders was even less at $21.59 million. Depending on how revenues fluctuated, an $18 million plus payout each year for at least five consecutive years pursuant to the Agreement could devastate the Company and put it in the red. Although the Agreement was never presented to the Company's shareholders for their approval it is no surprise that the Company's shareholders overwhelmingly rejected the compensation scheme at the Company pursuant to their advisory vote under the Dodd-Frank Act.

73.     In effect, what Biglari has pushed through is the ultimate entrenchment mechanism. As a result of the Agreement, the Board can never disagree with Biglari to the point that any real acrimony arises because the resignation of Biglari could destroy the Company. Similarly, the Agreement serves as a deterrent to any shareholder of the Company who wishes to nominate their own slate of candidates as engaging in a successful proxy battle would result in a substantial diversion of revenue from the Company. Likewise, the Agreement also serves as a deterrent to private equity firms, strategic partners or others who may be interested in acquiring BH, as the resulting value destruction at the Company would not justify the acquisition.

**BH's Rights Offering**

74.     Although the Agreement firmly cements Biglari's control over the Company, in that it renders him effectively immune from removal as CEO, it appears that he is not yet

---

[3] Further to the Licensing Agreement, on May 17, 2013 BH disclosed that it had authorized Steak n Shake to use Biglari's likeness in an agreement dated May 14, 2013. Exhibit 10.01 to Form 10-Q filed with the SEC May 17, 2013.

satisfied with how much power he has and still wants full voting control over the Company at any cost.

75.     In April 2011, Biglari proposed to recapitalize the Company through the creation of a dual class stock structure. The Company planned to designate all existing common stock as Class A and issue ten Class B shares through a pro-rata dividend for each Class A share outstanding. Class B shares would be entitled to one-one hundredth of one vote per share and economic rights equivalent to one-fifth of Class A shares. An article by Jonathan Maze commented on the proposal saying:

> Once again, Sardar Biglari is trying to protect his company from the dreaded scourge of the small investor. Biglari Holdings earlier this week proposed the creation of a dual class share structure, a move that could enable him to acquire more companies even while preserving his own control over the company.

> Biglari has made numerous efforts that have been clearly aimed at keeping out smaller, short-term investors. Among his first acts upon taking over Steak N Shake years ago was to engineer a reverse stock split to dramatically increase the price of shares.

76.     Given investor criticism of the dual stock proposal it was never implemented. But Biglari has not given up. Now instead of seeking to implement a dual class structure at BH, Biglari, just as he did with Western Sizzlin is pursuing a shareholder rights offering (the "Offering"). On February 5, 2013 the Company filed a Form 8-K with the SEC stating in relevant part:

> On February 5, 2013, Biglari Holdings Inc. (the "Company") filed a registration statement on Form S-3 with the Securities and Exchange Commission (the "SEC") for a rights offering to its existing shareholders. The rights offering will be made through the distribution of transferable subscription rights as a means of purchasing shares of the Company's common stock at a subscription price to be decided. Assuming the rights offering is fully subscribed, the Company expects to receive gross proceeds of approximately $50 million, minus the expenses of the rights offering. The net proceeds will be used for general corporate purposes as well as for making acquisitions or investments. The Company has not identified any acquisitions or investments for which it intends to use the offering proceeds. It is important to note that the Company is in the

business of owning other businesses in whole and in part without regard to any particular industry.

The Company has postponed a special meeting to implement a dual class structure of its common stock and thus gain increased flexibility in structuring acquisitions and financing transactions. In the absence of a dual class structure, the Company intends to conduct a rights offering as an alternative means of financing future acquisitions or investments to augment the Company's growth.

77.     Under the Offering, each holder of common stock of BH is entitled to receive one right per share that they own, enabling them to subscribe for one common share. The rights are transferable. The Company purportedly states the Offering is for the purpose of future acquisitions or investments but has not provided any indication as to what those acquisitions or investments may be. Although the rights has preliminarily been planned to be offered at a discount to the selling current price of the Company's common stock, it is unlikely that there will be significant participation by the Company's minority shareholders in the Offering given the high cost of the stock. Rather, just as was the case with Western Sizzlin, the Offering will be an opportunity for Biglari to further acquire shares of the Company at a discount to their current trading value and further entrench himself.

### Biglari's Complete Domination of BH

78.     Biglari uses the Company to accomplish his own goals rather than creating value for BH or its public shareholders. This is so well known that the market that according to a Seeking Alpha article, the market factors in a "Biglari Penalty" to the pricing of the stock. The article states in relevant part:

> Investors initially thought Biglari was the second coming of Warren Buffett. The compensation plan, company name change and initial proposal to issue Class A and B voting shares has resulted in a "Biglari Penalty" priced into the stock versus a "Buffett Premium."

79.     BH's Board has abdicated its responsibility of oversight and instead has allowed Biglari and his minions to determine the representation of the Board and entangle BH in the wrongdoing alleged herein.

80.    Biglari's complete domination and control over BH's Board of Directors is evidenced by his ability to appoint loyalist directors.   Virtually all of the directors currently serving on BH have been handpicked and are subservient to Biglari.   For example, an article on the Inelegant Investor has called one of the most recent additions to the Company's Board, Defendant Mastrian a "Puppet."   The article states in relevant part:

> ***Sardar Biglari has found a fifth person to rubber stamp his decisions***. Biglari Holdings (BH) filed an 8-K yesterday noting it had added James Mastrian to its Board, increasing its size to six members. From the filing:
>
>> On August 14, 2012, the Board of Directors (the "Board") of Biglari Holdings Inc. (the "Company") increased the size of the Board to six members and elected James P. Mastrian as a director of the Company. The Board also appointed Mr. Mastrian to serve on both the Audit Committee and the Governance, Compensation and Nominating Committee.
>>
>> Mr. Mastrian, age 69, retired from Rite Aid Corporation in August 2008. He was the special advisor to the Chairman and Chief Executive Officer. Prior to that, from October 2005 to August 2007, he was the Chief Operating Officer of Rite Aid Corporation.
>
> Interestingly, the filing fails to note that Mr. Mastrian is also a Director at CCA Industries (CAW), in which Biglari Holdings owns a 12.8% stake, and on whose Board Sardar Biglari and Phil Cooley, Biglari Holding's Vice Chairman, sit. This is obviously public information, but is a glaring omission in this filing. Mr. Mastrian owns no shares of CCA according to the most recent proxy statement despite having served on the Board for some time.
>
> Mr. Mastrian's executive experience was almost entirely at Rite Aid(RAD) a perpetually troubled drugstore chain whose stock has underperformed for years while competing with some of the country's most successful retailers, Walgreens(WAG) and CVS(CVS). In an industry with robust products, Rite Aid has long been headed towards bankruptcy.
>
> There is nothing in Mr. Mastrian's history to suggest that he will be a strong independent Director at Biglari Holdings, and the failure to mention his service at CCA is a disturbing omission. ***Mr. Biglari has said that the company should be viewed as a' jockey stock' and as such he has packed his Board with sycophantic groomsmen, of whom Mr. Mastrian is only the latest.***

(Emphasis supplied).

81.     Additionally, Biglari can remove BH Board members with impunity.  As discussed above, the Indiana Business Journal wrote that Biglari "managed to push out every board member unwilling to give him dictatorial authority over Steak n Shake despite his relatively modest ownership stake."

82.     Biglari has managed to firmly entrench himself and the Board of his choosing. His actions, along with the remaining defendants who have willfully neglected their roles as fiduciaries of the Company and its shareholders have caused the Company significant injury. The pattern and practice of Defendants' breaches of their fiduciary duties to the Company and its shareholders subjects, will persist in subjecting, BH to harm because the adverse consequences of the injurious effects are ongoing.

## DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

83.     Plaintiff brings this action derivatively in the right and for the benefit of BH to redress injuries suffered, and to be suffered, by BH as a direct result of the breaches of the Individual Defendants fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.  BH is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction in this Court that it would not otherwise have.

84.     Plaintiff will adequately and fairly represent the interests of BH and its shareholders in enforcing and prosecuting its rights.

85.     Plaintiff is the owner of BH common stock and was the owner of BH common stock at all times relevant to the Individual Defendants' wrongful course of conduct alleged herein.

86.     At the time that this action was commenced, the BH Board consisted of the following directors: Defendants Sadar Biglari, Philip Cooley, James Mastrian, William Johnson, Kenneth Cooper and Ruth Person.

87.    As a result of the facts set forth herein, Plaintiff has not made any demand on the BH Board to institute this action against the Individual Defendants. Such demand would be a futile and useless act with respect to each and every one of the Individual Defendants because they are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action for the following reasons:

88.    The Board of Directors lacks independence because they are entangled in a web of corporate interests built around Biglari. As set forth in detail above, Biglari habitually stands to personally benefit from the ways in which he controls BH's operations to the detriment of BH and its shareholders, and has surrounded himself with a complicit board that will aid him in his self-interested pursuits. In and of itself, the implementation of the self serving Licensing Agreement from which Biglari stands to profit at the potential cost of putting the Company into the red demonstrates his utter disregard for the Company and shareholders' best interests.

89.    Biglari's control over and involvement with BH's current directors dates back to his college days when Defendant Cooley was his professor. By 2000 Biglari brought Defendant Philip Cooley onto the board of Biglari Capital as an advisory director. In 2005, Biglari brought Defendant Philip Cooley onto the board of Western Sizzlin, where Cooley became the Vice Chairman. Defendant Cooley and Biglari also concurrently served on the board of the Lion Fund, which, as is set forth in detail above, was instrumental in Biglari gaining control of BH. The two longtime associates also serve on the board of Consumer Credit Counseling Service of Greater San Antonio. Cooley has stood by Biglari's side throughout his string of self serving endeavors and is clearly under Biglari's control.

90.    Biglari's control and influence over BH's current board members extends far past Cooley. Defendant William Johnson, who joined BH's board in 2012, also has corporate ties to Biglari and appears to be instrumental in Biglari's quest to gain a foothold in the insurance industry. Because insurance companies are paid premiums up front while losses are paid out

over time, they generate a significant float, which can be used to fund future investments— and analysts have suggested this is reason behind Biglari's growing interest in the insurance industry.

91.     Johnson was the Vice Chairman of the Fremont Michigan InsuraCorp ("Fremont") from 2003 through 2011. In 2009, Biglari began to acquire Freemont shares as part of an attempted takeover attempt. At Biglari's behest, Steak n Shake announced its intent to acquire 100% of Freemont's outstanding shares it did not already own, but the offer was rejected. Biglari's attempted takeover was so troubling that soon after it failed, the state of Michigan introduced a bill designed to make the takeover of insurance companies with less than 200 employees such as Fremont more difficult. Biglari then attempted to takeover Fremont a second time, at which point the board relented and set out to sell the company to the highest bidder, which was ultimately Auto Club Insurance Association. In 2011, Biglari began acquiring shares in the insurance company Penn Millers', which was sold before Biglari had a change to launch a proxy contest. Now, with the benefit of Johnson's insurance experience, Biglari continues to branch out into the insurance industry—in late 2012, several months after Biglari brought Johnson onto BH's board, BH disclosed it had acquired a 9.5% stake in the insurance company Unico American Corporation.

92.     In addition, Defendant Kenneth Cooper served on the board of Western Sizzlin alongside Biglari and Defendant Cooley from early 2007 until it was acquired by BH in 2010. Thus, he has been instrumental and complicit in Biglari's takeovers of Western Sizzlin and BH's acquisition of Biglari Capital. Biglari is also board member of Ascot Management, LLC, which Defendant Kenneth Cooper founded in 2006. Finally, defendant Cooper is an investor in the Lion Fund and has been for years.

93.     Similarly, Defendant Ruth Person served on the board of BH's predecessor, Steak n Shake, along with Defendants Biglari and Cooley, who joined the Steak n Shake board in 2008. Defendant Person was complicit in Biglari's scheme to take control of Steak n Shake and was part of the unanimous vote that put him in control.

94. The Board's most recent addition, Defendant James Mastrian, further epitomizes Biglari's control of the Board. As set forth above, an article on the Inelegant Investor characterized Defendant Mastrian's joining the Board as Biglari gaining a fifth "rubber stamp." Mastrian is a member of the CCA Industries Inc. board along with Defendants Biglari and Cooley, however, when he joined BH's board, this fact was surreptitiously undisclosed. Defendant Mastrian's recent position on the Board demonstrates the degree to which Defendant Biglari controls BH's board and fills its seats with individuals under his control.

95. Moreover, the Company has admitted in its 14A Proxy Statement filed with the SEC on February 27, 2013 that Defendants Biglari and Cooley are not independent directors pursuant to the requirements of the New York Stock Exchange.

96. Additionally, Defendants Mastrian, Johnson, Cooper and Person lack independence from Defendants Biglari and Cooper, who are not disinterested and/or independent. Defendants Mastrian, Johnson, Cooper and Person exert influence over the compensation for Defendants Biglari and Cooper by virtue of their positions as members of the merged Governance and Nominating and Compensation Committee. The Compensation Committee annually reviews and approves corporate goals and objectives relevant to the compensation for Defendants Biglari and Cooley and evaluates their performance in light of those goals and objectives, and approves their compensation level based upon these evaluations. This lack of independence renders Defendants Mastrian, Johnson, Cooper and Person incapable of impartially considering a demand to commence and vigorously prosecute this action.

97. Defendants face a substantial likelihood of being held liable for breaching their fiduciary duties of loyalty and good faith as alleged herein, and are therefore incapable of disinterestedly and independently considering a demand to commence and vigorously prosecute this action.

98. The principal professional occupation of Defendant Biglari is his employment with the Company, pursuant to which he received significant compensation from the Company.

In addition, BH's non-employee directors have received, and continue to receive, substantial compensation in the form of cash and stock option awards. These defendants are also interested in maintaining their positions on the Board so as to safeguard their substantial compensation and stock options. The following charts illustrate the substantial compensation that these directors have received, which further demonstrates that demand upon such individuals would be futile:

| 2012 COMPENSATION | |
|---|---|
| **Name** | **Total Compensation** |
| Sardar Biglari | $10,917,788 |
| Philip Cooley | $153,500[4] |
| Kenneth Cooper | $55,981 |
| Ruth Person | $47,481 |
| William Johnson | $36,428 |
| James Mastrian | $7,427 |

| 2011 COMPENSATION | |
|---|---|
| **Name** | **Total Compensation** |
| Sadar Biglari | $4,922,655 |
| Philip Cooley | $143,408[5] |
| Kenneth Cooper | $43,261 |

[4] Per BH's February 27, 2013 Def 14A filing, $17,500 of this amount includes directors fees from Cooley's service on the Board of CCA Industries, in which BH has a significant ownership interest.
[5] Per BH's February 27, 2013 Def 14A filing, $30,000 of this amount includes directors fees from Cooley's service on the Board of CCA Industries, in which BH has a significant ownership interest.

| Ruth Person | $45,280 |
|-------------|---------|

99.     The entire BH Board and senior management participated in the wrongs complained of herein. For the reasons described herein, BH's directors are not disinterested or independent. Pursuant to their specific duties as Board members, each was charged with the management of the Company and the conduct of its business affairs. Each of the above referenced defendants breached the fiduciary duties they owed to BH and its shareholders in that they have aided and abetted Biglari in his quest to control the Company and its operations to the detriment of shareholders. Thus, the BH Board cannot exercise independent objective judgment in deciding whether to bring this action or whether to vigorously prosecute this action.

100.     The purpose of BH's Audit Committee is to assist the Board in fulfilling its oversight responsibilities. Specifically, the Audit Committee is to assist the Board in overseeing: (1) the integrity of the Company's financial statements (2) the Company's compliance with legal and regulatory requirements (3) independent auditors' qualifications and independence; and (4) the performance of independent auditors and the Company's internal audit function. The Company's Audit Committee also operates pursuant to the Company's Ethical Code, which states: "Any director or executive officer of the Company shall alert the CEO to any material transaction or relationship that may reasonably lead to the existence of a conflict of interest. No action may be taken with respect to such transaction or party unless and until such action has been approved by the Audit Committee." However, as interested members of BH's Audit Committee, Defendants Cooper, Person, Mastrian and Johnson do not stand in a position to independently act in the Company's best interests and are hopelessly conflicted. Thus, any demand upon them relating to Biglari's self-interested transactions would be futile.

101.     Each of the key officers and directors knew of and/or directly benefited from the wrongdoing complained of herein thereby rendering demand futile.

102.     The Individual Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from BH's

stockholders or recklessly and/or negligently disregarded the wrongs complained of herein, and are therefore not disinterested parties.

103.    In order to bring this suit, all of BH's directors would be forced to sue themselves and persons with whom they have extensive business and personal entanglements, which they will not do, thereby excusing demand.

104.    The acts complained of constitute violations of the fiduciary duties owed by BH's officers and directors and these acts are incapable of ratification.

105.    Any suit by the Company's current directors to remedy these wrongs would likely expose the Individual Defendants and BH to further violations of the securities laws that would result in civil actions being filed against one or more of the Individual Defendants, thus, they are hopelessly conflicted in making any supposedly independent determination whether to sue themselves.

106.    BH has been, and will continue to be, exposed to significant losses due to the wrongdoing complained of herein, yet the Individual Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for BH any part of the damages BH suffered and will suffer thereby.

107.    Moreover, despite the Individual Defendants having knowledge of the claims and causes of action raised by plaintiff, the current Board has failed and refused to seek to recovery for BH for any of the wrongdoing alleged by plaintiff herein. In fact, on April 5, 2013, counsel for Plaintiff sent a Request for Inspection of Books and Records demand letter to Biglari and BH seeking information to investigate among other things, the Licensing Agreement and mismanagement within the Company. Counsel for the Company responded on April 12, 2013, and refused to provide any of the requested information. Despite the Board's knowledge of alleged wrongdoing, it has refused to take any corrective action and instead, has stonewalled Plaintiff's attempt to inspect the Company's books and records under Ind. Code §§23-1-52-1, et seq.

108.    Moreover, Plaintiff has not made any demand on shareholders of BH to institute this action since demand would be a futile and useless act for the following additional reasons: 1) BH is a publicly held company with over 1.4 million shares outstanding. Making demand on such a number of shareholders would be impossible for Plaintiff who has no way of finding out the names, addresses of phone numbers of shareholders.  Making demand on all shareholders would force Plaintiff to incur huge expenses, assuming all shareholders could be individually identified. 2) Furthermore, the conduct complained of herein could not have been the product of good faith business judgment, and each of these directors faces a substantial likelihood of liability for breaching their fiduciary duties because, through their intentional misconduct, they have subjected BH to substantial damages.  Accordingly, making a pre-suit demand on the Individual Defendants would be futile.

## COUNT I
## (AGAINST THE INDIVIDUAL DEFENDANTS FOR BREACH OF FIDUCIARY DUTY)

109.    Plaintiff incorporates by reference each of the preceding paragraphs as though they were set forth in full herein.

110.    The Individual Defendants owed a fiduciary duty to BH to manage the Company in accordance with its best interests, as well as the best interests of its shareholders. Additionally, by reason of their positions as directors, officers and controlling shareholders of BH, the Individual Defendants owed BH and its stockholders fiduciary duties of care, loyalty, candor, good faith and fair dealing.  As fiduciaries, to discharge these duties, the Individual Defendants were required to exercise prudent supervision over management, policies, practices, controls, and financial and corporate affairs of BH.

111.    The Individual Defendants, however, breached their fiduciary duties by failing to properly supervise and monitor the adequacy of BH's internal controls and by allowing Defendant Biglari to engage in self-serving transactions such as the implementation of Licensing Agreement and the inflated compensation packages set forth above.

112.    Additionally, Defendants agreed to and did participate with and/or aided and abetted one another in a deliberate course of action designed to divert corporate assets to themselves and/or other insiders in a manner to benefit Defendants and to ensure their voting control over BH.   Defendants breached their fiduciary duties by entering into a series of transactions calculated at suppressing the rights of shareholders, including transactions that failed to provide the Company with reasonable value and restricted the purchasing activities of other shareholders, as set forth above.  In taking these actions, Defendants lacked reasonable grounds to believe that a threat to corporate policy and effectiveness exists, and their actions were thus unreasonable in relation to a nonexistent threat.

113.    Each of Defendants' acts in causing or allowing Biglari to engage in the self serving transactions set forth above and abdicating his or her oversight responsibilities to the Company have subjected the Company to liability for violations of applicable laws, and therefore were not the product of a valid exercise of business judgment.  Rather their acts constituted a complete abdication of their duties as officers and/or directors of the Company.

## COUNT II
## (AGAINST THE INDIVIDUAL DEFENDANTS FOR GROSS MISMANGEMENT)

114.    Plaintiff incorporates by reference each of the preceding paragraphs as though they were set forth in full herein.

115.    Defendants had a duty to BH and its shareholders to prudently supervise, manage, and control the operations, business, and internal financial accounting and disclosures of the Company.  Defendants, however, by their actions and by engaging in the wrongdoing alleged herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the business of BH in a manner consistent with the duties imposed upon them by law. By committing the misconduct alleged herein, Defendants breached their duties of due care, diligence, and candor in the management and administration of BH's affairs and in the use and preservation of the Company's assets.

116. During the course of the discharge of their duties, Defendants were aware of the unreasonable risks and losses associated with their misconduct. Nevertheless, Defendants caused BH to engage in the scheme described herein which they knew had an unreasonable risk of damage to the Company, thus breaching their duties to the Company. As a result, Defendants grossly mismanaged BH, thereby causing damage to the Company.

## COUNT III
## (AGAINST THE INDIVIDUAL DEFENDANTS FOR CONTRIBUTION AND INDEMIFICATION)

117. Plaintiff incorporates by reference each of the preceding paragraphs as though they were set forth in full herein.

118. BH is alleged to be liable to various persons, entities and/or classes by virtue of the facts alleged herein that give rise to Defendants' liability to the Company.

119. BH's alleged liability on account of the wrongful acts, practices, and related misconduct alleged arises, in whole or in part, from the knowing, reckless, disloyal and/or bad faith acts or omissions of Defendants, and the Company is entitled to contribution and indemnification from each defendant in connection with all such claims that have been, are, or may in the future be asserted against BH, by virtue of the Individual Defendants' misconduct.

## COUNT IV
## (AGAINST THE INDIVIDUAL DEFENDANTS FOR ABUSE OF CONTROL)

120. Plaintiff incorporates by reference each of the preceding paragraphs as though they were set forth in full herein.

121. The Individual Defendants' conduct, as alleged herein, constituted an abuse of their control over BH.

122. As a direct and proximate result of the Individual Defendants' abuse of control, the Company has suffered, and will continue to suffer, damages for which the Individual Defendants are liable. Plaintiff, moreover, has no adequate remedy at law.

- 43 -

**COUNT V**
**(AGAINST THE INDIVIDUAL DEFENDANTS FOR**
**WASTE OF CORPORATE ASSETS)**

123.    Plaintiff incorporates by reference each of the preceding paragraphs as though they were set forth in full herein.

124.    The Individual Defendants' conduct, as alleged herein, constituted a waste of the corporate assets of BH.

125.    As a direct and proximate result of the Individual Defendants' abuse of control, the Company has suffered, and will continue to suffer, damages for which the Individual Defendants are liable. Plaintiff, moreover, has no adequate remedy at law.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment as follows:

1.      For rescission of the Licensing Agreement and other transactions at issue herein;

2.      For damages against and/or restitution from Defendants in an amount to be proven at trial;

3.      Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties;

4.      Directing BH to take all necessary actions to reform and improve its corporate governance and internal control procedures so that they comply with relevant laws and prohibit and prevent any Individual Defendant, including, but not limited to Defendant Biglari, from engaging in self-interested transactions to the detriment of the Company and its shareholders;

5.      For an order putting forward a shareholder vote resolution for amendments to the Company's Articles of Incorporation and taking such other actions as may be necessary to place before shareholders for a vote on the following Corporate Governance Policies:

(i)     appointing a non-executive Chair of the Board who is not related to or affiliated to Defendant Biglari or companies with which he has any meaningful personal or financial ties;

(ii)     appointing an independent Chair of the Board's Audit Committee;

(iii)     appointing at least three independent directors to the Governance and Nominating Committees of the Board;

(iv)     a proposal to implement procedures for greater shareholder input into the policies and guidelines of the Board; and

(v)     appropriately test and then strengthen the independence of audit control functions.

6.     Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

7.     Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Respectfully submitted,


Offer Korin [IN BAR 14014-49]
Linda L. Vitone [IN Bar 23389-29]
KATZ & KORIN, PC
334 North Senate Avenue
Indianapolis, Indiana 46204-1708
317-464-1100; 317-464-1111-fax
okorin@katzkorin.com
lvitone@katzkorin.com

Lionel Z. Glancy
Louis Boyarsky
GLANCY BINKOW & GOLDBERG LLP
1925 Century Park East Suite 2100
Los Angeles, California 90067
310-201-9150; 310-201-9160
lglancy@glancylaw.com
lboyarsky@glancylaw.com

Avi Wagner
THE WAGNER FIRM
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
310-491-7949; 310-694-3967
avi@thewagnerfirm.com

Counsel for Plaintiff

## VERIFICATION

I, Chad R. Taylor, do hereby verify that I am a holder of common stock of Biglari Holdings, Inc., and was a holder of such common stock at the time of the wrongs complained of in the foregoing Verified Derivative Complaint ("Complaint"). I have authorized the filing of the Complaint. I have reviewed the Complaint and all of the averments contained in the Complaint regarding me are true and correct upon my personal knowledge and, with respect to the remainder of the averments, are true and correct to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

DATE: May 2̲7̲, 2013

_____
Chad R. Taylor