UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| CHAD R. TAYLOR Derivatively on Behalf of Himself and All Others Similarly Situated,     ) ) ) | |
| Plaintiff,     ) ) | |
| vs.     ) ) | |
| SARDAR  BIGLARI, PHILLIP L. COOLEY, KENNETH R. COOPER, WILLIAM L. JOHNSON, JAMES P. MASTRIAN, RUTH J. PERSON, BIGLARI HOLDINGS, INC. Nominal Defendant,     ) ) ) ) ) ) ) ) ) | No. 1:13-cv-00891-SEB-MJD |
| Defendants.     ) | |

**ORDER DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

This cause is before the Court on Plaintiff's Motion for Preliminary Injunction [Docket No. 24], filed on August 16, 2013, pursuant to Rule 65 of the Federal Rules of Civil Procedure. Plaintiff Chad Taylor, derivatively on behalf of other shareholders of Biglari Holdings, Inc. (BH), seeks to enjoin Defendants Sardar Biglari ("Biglari"), Phillip L. Cooley, Kenneth R. Cooper, William L. Johnson, James P. Mastrian and Ruth J. Person (collectively, the "Board") and nominal Defendant Biglari Holdings, Inc. ("BH") from carrying out a rights offering initiated by BH, whereby the right to purchase shares was extended to BH shareholders. The rights offering commenced on August 27, 2013, and is scheduled to remain open until September 16, 2013.

Having considered Plaintiff's motion and the briefs submitted by the parties, the Court hereby DENIES Plaintiff's motion for injunctive relief.

## Factual Background

Biglari Holdings ("BH") is an Indiana corporation whose assets include two restaurant chains, Western Sizzlin and Steak n Shake. Compl. ¶ 4.[1] Plaintiff Chad R. Taylor holds five shares of BH stock, and has been a shareholder in the company throughout the period relevant to this litigation. ¶ 22; Defs.' Resp. 1.

The driving force behind the emergence of BH in its present form is its CEO and namesake, Defendant Sardar Biglari, who also serves on the BH board of directors. ¶ 25. In August 2005, the Lion Fund LLC—a private investment firm headed by Biglari—began buying Western Sizzlin stock, and in March 2006 he was appointed that company's chairman. ¶ 4. At least partially by means of a rights offering[2] to which he exercised oversubscription rights, Biglari increased his ownership share of Western Sizzlin, and by December 2006 he achieved enough voting power to engineer the election of a new board slate consisting of directors whom he had nominated. *Id.* Between 2007 and 2008, Biglari acquired shares of Steak n Shake, which at the time was a separate entity from Western Sizzlin. By June 2008, Biglari had become CEO and chairman of the board of Steak n Shake as well. ¶ 5. In August 2009, the two companies consolidated under Biglari's continued leadership as Steak n Shake acquired Western Sizzlin for a premium of 7% above market value; the board of the combined companies later passed a 20-for-1 "reverse stock split," increasing the entity's share price from $13 to $360 a share. ¶¶ 6–7. The next year, the company acquired Biglari Capital, the general partner of Biglari's Lion Fund; the deal was contingent on the ratification of a compensation package for Biglari that Plaintiff

---

[1] Henceforth all paragraph citations refer to Plaintiff's complaint (Compl.) unless noted otherwise.
[2] See below, p. 4, for a brief description of rights offerings.

characterizes as unduly generous. ¶¶ 67–69; *see also* Pl.'s Mot. 3. After making some modifications, the board approved the transaction as well as Biglari's compensation package, including $900,000 in annual salary plus incentive bonuses linked with the company's performance. ¶ 68. The joint company acquired its current name in April 2010, refashioning itself Biglari Holdings, Inc. ¶ 8. It currently employs over 22,000 people, and its share values have continued to rise, reaching $465.99 a share as of August 22, 2013. Defs.' Resp. 5.

The current members of the BH board are Sardar Biglari, Phillip L. Cooley, Kenneth R. Cooper, Dr. Ruth J. Person, William L. Johnson, and James P. Mastrian. ¶ 28–32. All five members of the board other than Biglari have professional ties to him that extend outside their joint service on the BH board; these contacts include involvement with Biglari's Lion Fund, service on the predecessor Western Sizzlin board, joint service on outside boards, and—in the case of Phillip Cooley—a previous professor-student relationship. Pl.'s Reply 5–6. Plaintiff alleges that the members of the board have approved three transactions in 2013—what he calls the "Retrenchment Transactions"—that improperly benefit Biglari personally rather than the broader corporate interest their fiduciary duties bind them to safeguard. Pl.'s Mot. 3–4. The first, the Licensing Agreement, entitles BH to use Biglari's name and likeness, conditioned on the company's obligation to pay Biglari 2.5% of gross corporate revenues for five years after any "triggering event," including the ouster of Biglari. ¶ 72; Pl.'s Mot. 4. The second is the company's sale of the Lion Fund back to Biglari; Plaintiff alleges that the sale was a means of circumventing Biglari's annual compensation cap with BH, allowing the nominally independent Fund to provide additional payments to him. Pl.'s Mot. 4.

The final "entrenchment transaction," and the subject of this motion, is the Rights Offering, first disclosed by BH in a Form S-3 Registration Statement on February 5, 2013. ¶ 76;

Defs.' Resp. 6. A rights offering is a corporate stock device for raising capital, whereby a corporation issues a number of "rights" to existing shareholders, entitling them—if they choose to invest the additional capital required for their exercise—to convert these rights into additional shares of stock. *Id.* at 7. If the rights offering is not fully subscribed by the existing shareholders, other shareholders who have exercised these rights may then "oversubscribe," meaning they can acquire the shares not taken. *Id.* The "rights" are distributed evenly in proportion to existing ownership shares (at 5 rights per share), and may be traded on the open market. As originally announced, the Offering aimed to raise approximately $50 Million for the company. *Id.* On August 6, 2013, the board made a final announcement of the details of the Rights Offering, in which prices were set and the capital target was raised to approximately $75 Million. *Id.* at 8. The Rights Offering commenced on August 27, 2013, and is currently ongoing, scheduled to conclude on September 16. Pl.'s Mot. 1.

On June 3, 2013, Plaintiff filed a shareholder derivative complaint against BH as a nominal defendant and the six board members as individual defendants, alleging that the "entrenchment transactions" and other board actions have violated the members' duty to the corporate interest. Compl. 1. The complaint contains counts for breach of fiduciary duty, gross mismanagement, abuse of control, and waste of corporate assets. *Id.* at 41–44.  On August 16, 2013, Plaintiff filed this Motion for Preliminary Injunction targeting only the Rights Offering.

## Legal Analysis

### Standard of Review

In reviewing a motion for injunctive relief, courts proceed in two distinct phases. First, we must determine whether the moving party has satisfied the threshold showing of entitlement to relief, which in turn consists of three elements: (1) absent a preliminary injunction, it will

suffer irreparable harm in the interim period prior to final resolution of its claims, (2) traditional legal remedies would be inadequate, and (3) its claim has some likelihood of succeeding on the merits. *Girl Scouts of Manitou Council, Inc., v. Girl Scouts of U.S. of Am., Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008); *Annex Books, Inc. v. City of Indianapolis,* 673 F. Supp. 2d 750, 753 (S.D. Ind. 2009). If the moving party clears this threshold, we proceed to the second stage, balancing "the nature and degree of the plaintiff's injury, the likelihood of prevailing at trial, the possible injury to the defendant if the injunction is granted, and the wild card that is the 'public interest.'" *Lawson Prods., Inc. v. Avnet, Inc.*, 782 F.2d 1429, 1433 (7th Cir. 1986).

Our balancing of these equitable factors is not rigid or formulaic; rather, we employ a "sliding scale" approach—meaning, for example, that "the more likely it is the plaintiff will succeed on the merits, the less balance of irreparable harms need weigh toward its side; the less likely it is the plaintiff will succeed, the more the balance need weigh towards its side." *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 12 (7th Cir. 1992) (citations omitted).  The sliding scale approach "is not mathematical in nature, rather ›it is more properly characterized as subjective and intuitive, one which permits district courts to weigh the competing considerations and mold appropriate relief." *Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 895–896 (7th Cir. 2001) (quoting *Abbott Labs.*, 971 F.2d at 12).

Although discretion to issue a preliminary injunction lies with the courts, injunctive relief it is to be considered an "extraordinary remedy," appropriate only on a "clear showing of need." *See Sierra Club v. Gates,* 499 F. Supp. 2d 1101, 1126 (S.D. Ind. 2007). The moving party bears the burden of proof, and must establish by preponderance of the evidence that he is entitled to the requested relief. *Id.*

## Discussion

We consider first the three threshold factors necessary to establish entitlement to injunctive relief. Only after determining whether Plaintiff has cleared this preliminary hurdle shall the larger balance of the equities for and against his proposed order blocking the Rights Offering be addressed.

## I.      Irreparable Harm

Plaintiff argues that "the company and its stockholders will suffer immediate and irreparable harm" if the Court declines to enter an injunction, primarily because a Rights Offering will be difficult to unwind after the rights have been traded on the market and numerous new third-party interests have become involved. *See* Pl.'s Mot. 8–9. There are a number of flaws in this argument, beginning with his tardiness in filing this motion, which seriously undermines its persuasiveness on this score. In addition, his substantive claim of corporate harm is both speculative and conceptually muddled.

## A. The Timing of the Motion

As Defendants have pointed out, a delay in requesting equitable relief is inconsistent with a claim of irreparable injury. Defs.' Resp. 10–11 (citing *Shaffer v. Globe Protection, Inc.,* 721 F.2d 1121, 1123 (7th Cir. 1983)). If a plaintiff has already been subjected to the putative harm caused by the defendants' conduct for a significant period of time, he or she cannot credibly argue that pressing hardship requires injunctive relief in the interim before the underlying matter is resolved. *Shaffer,* 721 F.2d at 1123 (two-month delay in filing motion weighs heavily against issuance of injunction); *see also Boczar v. Kingen*, 1999 WL 33109074, at *11 (S.D. Ind. July 2, 1999) (citing *Tough Traveler, Ltd. v. Outbound Prods.*, 60 F.3d 964, 968 (2d Cir. 1995)) (six-month delay in filing "repudiates" a claim of irreparable injury).

Here, BH first disclosed its planned Rights Offering on February 5, 2013, with the final details announced on August 6. Defs.' Resp. 11. The company's S-3 disclosure, filed in February, made the structure of the transaction clear; except for a subsequent increase in the capital target from $50 to $75 Million, Plaintiff and other shareholders were on notice from that point forward, should they object to the plan as a means of further entrenching Biglari. *Id.* at 7–8. When Plaintiff filed his complaint in this case on June 3, he included no request for injunctive relief, even though he knew of the Rights Offering at the time and included it in his list of the Board's allegedly improper actions. *See* Compl. 31–32, 44–45. Instead, he waited until August 16 to file this motion, praying that the Court grant relief no later than the date of the Rights Offering's termination on September 16. In so doing, Plaintiff all but guaranteed that we would be unable to receive briefing and resolve the issue until *after* trading on the Offering had already begun—thus unnecessarily creating the very "irreparable" harm of which he now complains. It is true that, until trading on the rights actually opened on August 22, the process Plaintiff here seeks to enjoin was not yet active. *Cf. Shaffer,* 721 F.2d at 1123 (noting that plaintiff waited two months after unfavorable decision on employment claim to seek an injunction). But the management retrenchment that Plaintiff alleges to be the harm flowing from the Rights Offering is just as speculative now as it was three or six months ago; certain details have been fleshed out, but Plaintiff's theory was already fully formed in June. *See* Compl. 32, ¶ 77 ("the Offering will be an opportunity for Biglari to further acquire shares of the company… and further entrench himself"). This unnecessary and counterproductive delay in seeking relief, even leaving aside the substantive merits of Plaintiff's argument, weighs against a finding of irreparable harm.[3]

---

[3] Plaintiff's reply brief addresses the subject, arguing that precedent supports the proposition that an earlier motion for injunction—before the final details of the Offering had been announced—would have been premature, and the claim unripe. Pl.'s Reply 14–15 (citing *S. Austin Coal. Cmty. Council v. SBC Commc'ns Inc.*, 191 F.3d 842, 843 (7th Cir. 1999); *Rovner v. Health-Chem Corp.,* 1996 WL 377027, at *5 (Del. Ch. July 3, 1996)). This unduly

**B. Plaintiff's Claim of Injury**

Because this is a derivative action, Plaintiff bears the burden of establishing the risk of irreparable harm to the corporation as a whole, rather than simply to his personal interests as a shareholder. *See, e.g., In re Countrywide Fin. Corp. Derivative Litig.,* 542 F. Supp. 2d 1160, 1176–1178 (C.D. Cal. 2008). As the Indiana Supreme Court has explained, derivative actions may not be the proper vehicle for allegations of a shareholder's voting power dilution or the oppression of minority interests by a controlling bloc. *See G & N Aircraft, Inc. v. Boehm,* 743 N.E.2d 227, 235 (Ind. 2001) (holding that the distinction between direct and derivative actions rests on the "rights the shareholder asserts"). To state a proper derivative injury claim, Plaintiff must demonstrate that failure to issue an injunction will render irreparable either an injury sustained by the corporation or a third party's failure to perform a duty owed to it. *Id.* at 234. A claim that a corporation issued additional shares for inadequate consideration, thereby damaging the value of its shares on the whole *and* the shareholder's individual stake, is properly classified as derivative. *See Feldman v. Cutaia*, 951 A.2d 727, 732–734 (Del. 2008). On the other hand, an allegation that one shareholder lost voting strength relative to another—without an additional showing of harm to the corporate interest—describes an individual grievance rather than a corporate one. *Cf. G & N Aircraft*, 743 N.E.2d at 235.

Plaintiff's motion and brief reflect some conceptual slippage on this issue. While he announces the correct standard in alleging damage to the corporation and the body of its shareholders, the specifics of his claimed harm—and the authority he cites in support of it—are more consistent with an interest particular to minority shareholders rather than the corporation as

---

conflates a premature motion with a speculative one. It also mischaracterizes the decision in *Rovner,* which based its denial of an injunction not on the fact that a price had not yet been set (which would be consistent with a *premature* motion), but rather on the fact that the result of the Offering was not easily predictable (consistent with a *speculative* motion).

a whole. Shortly after reciting the proper elements of a derivative claim, Plaintiff's motion asserts that "the harm to Plaintiff is extensive because once completed S. Biglari will wield additional control of the Company and further his self-interested behavior." Further, he cites a Delaware case for the proposition that "a shareholder-plaintiff is irreparably harmed where an improper offering is completed." Pl.'s Mot. 8 (citing *Hollinger Intern., Inc. v. Black*, 844 A.2d 1022, 1090 (Del. Ch. 2004)). Shortly thereafter, he cites *Levco Alt. Fund Ltd. v. Reader's Digest Ass'n, Inc.*, 2002 WL 1859064 (Del. Aug. 13, 2002), for its holding that "the dilution of shareholder equity poses irreparable harm." Pl.'s Mot. 8 (citing *Levco*, 2002 WL 1859064, at *3). We have no reason to doubt the truth of that proposition, but *Levco* was a direct shareholder action, *id.* at *1, and the type of harm at issue there—retrenchment measures by controlling shareholders—is not suited to a derivative action. *See In re Gaylord Container Corp. S'holders Litig.*, 747 A.2d 71, 83 (Del. Ch. 1999) ("an entrenchment claim . . . [is] individual . . . when the shareholder alleges that the entrenching activity directly impairs some right she possesses as a shareholder."). Plaintiff has not alleged that any retrenchment from the Rights Offering will dilute the overall value of the stock because the rights are being offered for inadequate consideration—rather, he objects that the price is too high. *Cf. Feldman,* 951 A.2d at 732–734 (explaining that a suit alleging dilution through offering of stock for inadequate consideration is derivative). Indeed, none of Plaintiff's proffered supportive authority on this issue relates to derivative actions, and nowhere in his motion or supplementary brief does Plaintiff bridge the gap between a shareholder's individual harm—which his language and citations to case law seems to describe—and the irreparable injury to *corporate* interests required to sustain a motion for injunctive relief on a derivative claim.

The shortcomings in Plaintiff's argument amount to more than mere rhetorical imprecision. Defendants point out that no authority supports the notion that a transaction like the Rights Offering gives rise to corporate injury requiring injunctive relief. Furthermore, they point us towards a compelling reason why this might be so. On its face, the Rights Offering creates a subscription option that can be exercised on equal terms by large and small shareholders alike, *Cf. Levco,* 2002 WL 1859064, at *1 (enjoining a recapitalization that discriminated between voting and non-voting classes of stock), and it promises an unambiguous boon to the company: a $75 Million infusion of capital. Defs.' Resp. 8, 13 (citing Clark Decl., Ex. 14). Plaintiff contends that the Rights Offering, whatever its facial appearance, is little more than a ploy by Biglari and his compliant Board to deepen their control of the company; in support of this position he points to the high exercise price—which he says will effectively exclude small shareholders from participation—and the fact that Biglari extended his control with a previous company (Western Sizzlin) through a similar maneuver. Pl.'s Mot. 2, 5.

Even if we assume with Plaintiff that Biglari's purpose in conducting the Rights Offering is to increase his ownership share, Plaintiff's argument that such a strategic motive constitutes irreparable harm to the corporation suffers from two serious defects.

First, the claim that Biglari will exercise oversubscription rights to crowd out smaller shareholders and aggrandize his stock ownership is, at this stage, nothing more than a prediction. "Speculative injuries" are, by nature, insufficient to support a preliminary injunction. *E. St. Louis Laborers' Local 100 v. Belion Wrecking & Salvage Co.*, 414 F.3d 700, 704 (7th Cir. 2005) ("speculative injuries do not justify this extraordinary remedy"); *cf. Am. Hosp. Supply Corp. v. Hosp. Prods. Ltd.*, 780 F.2d 589, 595 (7th Cir. 1986) (upholding an injunction where the harm, though it had not yet occurred, was "pending"). Defendants have pointed us to a Delaware

10

decision dealing with similar facts. In *Rovner v. Health-Chem Corp.*, 1996 WL 377027 (Del. Ch. July 3, 1996), the court refused to enjoin a rights offering which the plaintiff theorized would lead to greater control for the company's CEO, reasoning that "since the Rights Offering has not yet commenced, the Court cannot evaluate on this record the probable result of that offering." 1996 WL 377027, at *13. Although we are, of course, not bound by this reasoning, we agree. Plaintiff has presented no evidence that the Rights Offering—already underway—is having the deleterious effects he predicted; his allegation that it fits within a pattern of behavior by Biglari is not enough to nudge his theory from the realm of guesswork (even educated guesswork) to that of impending fact.

Second, Plaintiff's argument contradicts the larger thrust of his complaint—that Biglari *already* dominates the company utterly. Plaintiff's multiple claims of Board misconduct are undergirded by the theory that the directors are beholden to Biglari; he alleges that Biglari has "complete domination and control over BH's Board of Directors," and that through his "minions" he treats the company as a mere vehicle for the advancement of his personal interests. Compl. 32–33, ¶¶ 78–80. If Biglari is already so firmly entrenched that the Board moves at his whim, it is difficult to understand—as Defendants point out—how the Rights Offering creates any new or distinct irreparable harm. *See* Defs.' Resp. 16–17. Since Plaintiff's chance of success on the merits, *see infra* § III, depends entirely on the notion that the Board that unanimously approved the Rights Offering was already compromised by its subservience to Biglari, even an argument that succeeded in overcoming its speculative weaknesses would founder on this fundamental internal inconsistency.

## II.     Inadequacy of Legal Remedies

Plaintiff has not convincingly shown that compensatory damages would be inadequate to remedy any harm to the corporation caused by the Rights Offering. In fact, he does not even directly address the issue in his motion or supplemental brief. *See* Defs.' Resp. 19. Plaintiff's argument on the issue, such as can be discerned, relates to his theory of irreparable harm: he asserts that "the Court will be hard pressed to unwind the Rights Offering with any reasonable ease, particularly because the rights in the offering will be tradeable, and therefore a number of third parties will be impacted by any attempts to rescind the transaction." Pl.'s Mot. 8–9. In his reply, Plaintiff does make a more explicit argument, but the decisions he cites merely underline the weakness of his case on this point—they deal with situations whose urgency or irrevocability distinguish them from the Rights Offering at issue here. *See MONY Group, Inc. v. Highfields Capital Mgmt., L.P.*, 368 F.3d 138, 148 (2d Cir. 2004) (enjoining a transaction that "could spell the loss of a business opportunity that (by its nature) can only exist at one point in time"); *Johnston v. Pedersen*, 28 A.3d 1079, 1091–1092 (Del. Ch. 2011) (concerning issuance of a preferred class of stock with a "super vote right" that could block other shareholders from a proportional share in governance). We agree with Defendants that Plaintiff has shown no reason why any legitimate harm to the corporation could not be addressed after the case is fully disposed of on the merits. The court could order Biglari himself to disgorge any acquisitions he makes without necessarily engaging in the more complicated task of unwinding the entire transaction. *See* Defs.' Resp. 18.

Additionally, Plaintiff's implicit argument on this score is weakened by the fact that he seeks compensatory damages for Defendants' alleged improprieties, including the Rights Offering. Compl. 44. While it may be true, as Plaintiff reminds us, that the possibility of a later damages award is not *per se* inconsistent with injunctive relief, *see Levco,* 803 A.2d at 428, the

inconsistency of his position is damaging. *See Candlewood Timber Grp. LLC v. Pan Am. Energy LLC*, 2003 WL 22417235, at *2 (Del. Ch. Oct. 22, 2003) *rev'd on other grounds,* 859 A.2d 989 (Del. 2004) (holding that "the complaint itself demonstrates that there is an adequate remedy at law; the complaint seeks money damages….").[4] Just as we see little basis for finding that the putative harm from the Rights Offering is irreparable, so too, relatedly, are we unconvinced that monetary compensation would not suffice to cure any such harm.

### III.  Reasonable Likelihood of Success on the Merits

Plaintiff's chance of prevailing on his challenge to the Rights Offering—and the other instances of alleged Board misconduct—depends on the threshold question of whether demand was excused.

Under Indiana law, a plaintiff in a shareholder derivative suit must satisfy certain threshold requirements in order for their claim to be considered.  A plaintiff must show (1) that she was a shareholder at the time of the transaction of which she complains,  (2) that she made efforts to obtain the requested action from the board of directors—or why she did not make demand on the board, and (3) that she fairly and adequately represents the interests of the shareholders as a whole. Ind. Code § 23-1-32-1; Trial Rule 23.1. The second criterion, the "demand" requirement, reflects the law's general attitude of deference towards the decisions made by a corporation's directors, as embodied in the Business Judgment Rule—"a presumption that in making a business decision, the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *G & N Aircraft,* 743 N.E.2d at 238 (citing *Aronson v. Lewis,* 473 A.2d 805, 812 (Del.

---

[4] Plaintiff does allege in his complaint that damages are inadequate for Count IV (Abuse of Control) and Count V (Waste of Corporate Assets). He does not, however, mention these counts anywhere in his brief or further develop any argument based on them specifically, and—as Defendants note—the original assertion in the complaint is likely without merit regardless. *See* Defs.' Resp. 20, n.14 (citing *Tomczak v. Morton Thiokol, Inc.*, 1985 WL 11542, at *3 (Del. Ch. Feb. 13, 1985)).

1984)). Indiana has adopted a "strongly pro-management" version of the Business Judgment Rule, *see G & N Aircraft,* 743 N.E.2d at 238, expressing its policy that "the decision whether and to what extent to investigate and prosecute claims . . . should in most instances be subject to the judgment and control of the board." Ind. Code § 23-1-32-4(b).  A plaintiff can ordinarily overcome the presumption in favor of the validity of board judgment only by pleading with particularity that the decision makers were compromised by conflicts of interests, or that the decision was so deficient as to constitute "recklessness or willful misconduct." *In re ITT Derivative Litig.,* 932 N.E.2d 664, 670 (Ind. 2010); *see also Carter ex rel. CNO Fin. Grp., Inc. v. Hilliard*, 970 N.E.2d 735, 748 (Ind. Ct. App. 2012).

Where, as here, the plaintiff initiates a derivative suit without first making demand on the corporation, he must show that demand would have been futile in order for the court to permit the suit to go forward. Ind. Code § 23-1-32-1. Because Indiana's statutes provide little guidance as to the standard governing demand futility, Indiana looks to Delaware's more fully developed body of corporate law. *See In re ITT*, 932 N.E.2d at 668. Delaware's governing law on the subject, derived from the landmark decision in *Aronson v. Lewis,* 473 A.2d 805 (Del. 1984), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244, 256 (Del. 2000), is summarized as follows:

> The test of demand futility is a two-fold test under *Aronson* and its progeny. The first prong of the futility rubric is "whether, under the particularized facts alleged, a reasonable doubt is created that ... the directors are disinterested and independent." The second prong is whether the pleading creates a reasonable doubt that "the challenged transaction was otherwise the product of a valid exercise of business judgment." These prongs are in the disjunctive. Therefore, if either prong is satisfied, demand is excused.

*Brehm*, 746 A.2d at 256. Thus, Plaintiff must show that one of the two prongs of the futility test is met; only then would we proceed to consider his substantive allegations of board misconduct

14

under Biglari. As Judge Easterbrook has noted, however, the outcome of the two-part inquiry

into demand futility almost invariably prefigures the court's resolution of the underlying claim: if

on the first prong a majority of the board is compromised by conflicts of interest, then its

decisions will likely be invalidated under the stringent "entire fairness" standard governing

interested transactions, *see Weinberger v. UOP, Inc.*, 457 A.2d 701, 710 (Del. 1983); if a court

decides the second prong in favor of a plaintiff, then the transactions challenged may be so

arbitrary or deficient that they fail to meet even the deferential scrutiny of the Business Judgment

Rule. *See Starrels v. First Nat. Bank of Chicago*, 870 F.2d 1168, 1172–1174 (7th Cir. 1989)

(Easterbrook, J., concurring). Thus, for our purposes in deciding this motion, meeting the

*Aronson* standard is essential to Plaintiff's burden of establishing a reasonable likelihood of

success on the merits.

Below we briefly summarize the parties' arguments regarding the Rights Offering's place

within the larger scheme of alleged impropriety on the part of the BH board.

## A. Board's Lack of Independence or Disinterestedness

In order to prevail under the first part of the *Aronson* test, Plaintiff must show reasonable

doubt as to a majority of the BH board's disinterestedness in the transaction or its members'

independence. A director has impermissible self-interest "whenever divided loyalties are present,

or a director has received, or is entitled to receive, a personal financial benefit from the

challenged transaction which is not equally shared by the stockholders." *Rales v. Blasband,* 634

A.2d 927, 932 (Del. 1993). Perhaps because he alleges that only one of the six corporate

directors—Biglari himself—has improper personal interest in the Rights Offering,[5] Plaintiff

---

[5] Plaintiff points out that the other individual Defendant board members are shareholders, and plan on participating in the Rights Offering. However, participation in this form is not a "personal financial benefit from the transaction which is not equally shared by its stockholders," since their right to participate is coextensive with the equal rights of all other holders of BH stock. Plaintiff has made no allegation that the other directors intend to use the Rights

argues instead that a majority of the board lacks independence from Biglari's dominant influence. A director lacks independence when his decisions are based on "extraneous considerations or influences" rather than the "corporate merits of the subject," *In re Abbott Labs. Derivative S'holders Litig.,* 325 F.3d 795, 807 (7th Cir. 2003); one such impermissible extraneous influence arises where a director is "beholden" to another interested director or corporate officer through personal relationship or otherwise excessive influence. *See Rales*, 634 A.2d at 936.

Plaintiff alleges that Sardar Biglari dominates the other five members of the BH board to such an extent that there is no independent decision making majority. *See* Pl.'s Reply 5. Defendant Phillip Cooley, BH's Vice Chairman and former audit committee chairman, has longstanding professional ties to Biglari, having served as an advisory director of Biglari Capital (a separate entity), a director of Western Sizzlin with Biglari before its integration with BH, and a board member of the Lion Fund. Compl. 11, ¶ 28. Plaintiff claims that because of these ties, and the fact that Cooley was Biglari's professor in business school, Cooley's independence is compromised. Pl.'s Reply 5. Although this might not amount to the "close familial or personal relationship" that Plaintiff's citation to case law suggests it does, *see* Pl.'s Reply 5 (citing *Orman v. Cullman*, 794 A.2d 5, 25 n.50 (Del. Ch. 2002)), the density of Cooley's extracurricular ties to Biglari may create a reasonable doubt whether he is not beholden to him for his positions of influence.[6]

---

Offering to entrench *themselves,* but rather that they voted for it because of their domination by Biglari. *See* Pl.'s Reply 4, n.7 (citing Opp Ex. 20 at BH-TAYLOR-000040).

[6] Defendants argue that since Biglari does not have majority ownership of BH, he cannot be said to have the power to remove directors with "impunity." As courts have recognized, however—most authoritatively in Delaware's *Oracle* decision—one director's leverage over another hardly begins or ends with sheer, literal financial dominance. *See* Defs.' Resp. 25–26; *see also In re Oracle Corp. Derivative Litig.*, 824 A.2d 917, 930–935 (Del. Ch. 2003).

The other four board members—Dr. Ruth Person, Kenneth Cooper, William Johnson, and James Mastrian—all have some professional ties to Biglari that extend beyond their joint BH board memberships. *See* Pl.'s Reply 5–6. As Defendants point out, these four members have been certified as "independent" under the public registration requirements of the New York Stock Exchange; although this may not be dispositive of the issue, *see In re Oracle Corp. Derivative Litig.,* 824 A.2d 917, 941, n.62 (noting that Delaware's context-sensitive analysis might diverge from NYSE standards regarding independence), the mere existence of professional relationships among board members, by itself, is insufficient to undermine their independence. In *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040 (Del. 2004), the Delaware court considered allegations that board members of Martha Stewart Living were compromised by their lack of independence from the eponymous central figure of the corporation, Martha Stewart. The court noted:

> Allegations that Stewart and the other directors moved in the same social circles, attended the same weddings, developed business relationships before joining the board, and described each other as "friends," even when coupled with Stewart's *94% voting power*, are insufficient, without more, to rebut the presumption of independence. They do not provide a sufficient basis from which reasonably to infer that [the board] may have been beholden to Stewart.

*Beam,* 845 A.2d at 1051 (emphasis added). In order to show that Biglari—with his 15.5% share of the company, *see* Defs.' Resp. 25—has enough leverage over other board members to render them incapable of independent decision making, Plaintiff will have to make a stronger showing than what he has done thus far.

**B. Whether the Rights Offering was the Product of "Sound Business Judgment"**

Under the second prong of the *Aronson* test, a plaintiff can show that demand is excused if the transaction in question is not entitled to the protections of the Business Judgment Rule. As the Seventh Circuit has explained, this entails an inquiry into "both the substantive due care

17

(substance of the transaction) as well as the procedural due care (an informed decision) used by the directors." *In re Abbott,* 325 F.3d at 808 (citing *Starrels*, 870 F.2d at 1171).

Here, Plaintiff argues that two transactions in particular are so substantively flawed that they were made in a matter that suggests bad faith—that the board "did not care [that] shareholders would suffer a loss" from them. *See In re Tyson Foods, Inc.*, 919 A.2d 563, 595 (Del. Ch. 2007). Plaintiff insists that members of the board deliberately undervalued the Lion Fund when selling it back to Biglari—thus consciously depriving the company of revenue. Pl.'s Reply 6. As support, he points to the fact that the board's Governance, Compensation, and Nominating Committee (GCN) ignored the recommendations of an outside valuation firm, pegging the fund's value at $1.7 Million rather than the recommended $8.8–10.2 Million. *Id.* Second, Plaintiff argues that the Licensing Agreement was so "draconian" that, if implemented, it would result in unsustainable expense and financial suicide for the company. Pl.'s Reply 9. Rather than argue that the Rights Offering itself is egregious on its face, Plaintiff insists that substantive bad faith on the board's part can be inferred from the larger pattern of behavior of which it is a part.[7]

Moreover, in procedural terms, Plaintiff asserts that in undertaking a number of BH's challenged transactions the board failed to act diligently or adequately inform itself, in violation of its duty of due care. According to Plaintiff, the BH board fell short of due diligence standards in failing to question Biglari regarding the Licensing Agreement, the amount of Biglari's compensation, and selling the Lion Fund. Pl.'s Reply 6, 9, 11–12. As to the Rights Offering

---

[7] Plaintiff also claims that the board violated its duty of disclosure by failing to disclose the purpose behind the Rights Offering in its initial February Form S-3 and August press release. *See* Pl.'s Mot. 8; Pl.'s Reply 17–18. We find this allegation to be without any independent weight, since it depends on the premise that the "real" purpose of the rights offering was improper—the main subject of the parties' dispute. Additionally, as Defendants point out, it does appear that the Form S-3 disclosed the possibility of vote-share dilution from the Rights Offering. *See* Defs.' Resp. 27, n.19.

itself, Plaintiff points to the fact that BH "has failed to produce even a single presentation or report regarding the Rights Offering"—and alleges that the only outside opinion the board sought was from counsel, whose communications it has partially withheld.[8] *Id.* at 12; *see also In re Del Monte Foods Co. S'holders Litig.*, 25 A.3d 813, 831 (Del. Ch. 2011) (holding that reliance on outside experts is an indicium of board procedural due care).

In response, Defendants note that while evidence of reliance on outside experts in agreeing on the Rights Offering may be lacking, Plaintiff can substantiate no allegation that the board engaged in *misconduct* or acted irrationally. Defs. Resp. 28. As they point out, an allegation that board decisions are unworthy of the cloak of the Business Judgment Rule must clear a "high hurdle." *In re Tyson Foods*, 919 A.2d at 595. The Delaware Supreme Court has described the burden thus: "Due care in the decision-making context is *process* due care only. Irrationality is the outer limit of the business judgment rule." *Brehm,* 746 A.2d at 264. In the absence of concrete evidence to the contrary, Defendants insist that no transaction promising to bring a large infusion of capital to a company can fairly be painted as irrational. Defs.' Resp. 29.

While Plaintiff has pointed to some facts that plausibly call into question the BH board's thoroughness and judgment in agreeing to a series of transactions highly favorable to Biglari in recent years, we cannot say at this stage that Plaintiff will succeed in establishing that the board either engaged in egregiously defective decision-making or committed itself to transactions so unfavorable to the corporate interest that they reflect bad faith.

## IV.    Balance of the Equities and Conclusion

Our task in ruling on this motion is not to weigh in definitively on the merits of Plaintiff's challenge to the Rights Offering and other BH transactions. Indeed, at this threshold stage, we

---

[8] Disputes between the parties as to this and other evidentiary issues are pending under the consideration of the Magistrate Judge.

examine the merits only to determine whether the underlying claim has "some likelihood" of success. *Girl Scouts,* 549 F.3d at 1086. Even if we assume for the moment that Plaintiff has met that relatively low bar, he still has not passed the three-part test necessary to show a threshold entitlement to injunctive relief—as we have noted, he has failed to demonstrate either irreparable harm or the inadequacy of legal remedies. *See Girl Scouts,* 549 F.3d at 1086 ("If the court determines that the moving party has failed to demonstrate any one of these three threshold requirements, it must deny the injunction").

While we need not proceed, then, to the second, balancing stage of the analysis, we do briefly note that Plaintiff's argument will likely face insurmountable difficulties at that stage as well. In weighing the impact of Plaintiff's claimed injury and his likelihood of success on the merits, we use a "sliding scale" approach: "[T]he more likely it is the plaintiff will succeed on the merits, the less balance of irreparable harms need weigh toward its side; the less likely it is the plaintiff will succeed, the more the balance need weigh towards its side." *Annex Books, Inc. v. City of Indianapolis*, 673 F. Supp. 2d 750, 753 (S.D. Ind. 2009) (quoting *Abbott Labs.*, 971 F.2d at 12). However, even if Plaintiff had cleared the initial threshold, his showing as to success on the merits is not nearly overwhelming enough to trigger an exercise of our overriding discretion.

Neither is the potential harm to Defendants if an injunction issues—another factor to be considered at the equitable balancing stage—as trivial as Plaintiff would have us believe. *See Meridian Mutual Ins. Co. v. Meridian Ins. Group, Inc.*, 128 F.3d 1111, 1121–1122 (7th Cir. 1997). He urges that an injunction would do nothing more to Defendants than "assure the status quo." Pl.'s Mot. 9. To the contrary, Defendants point to two distinctly significant harms they and the corporation would suffer. First, an injunction would frustrate a capital-raising operation that

figures heavily into the company's strategic planning for the year—even a significant delay could impact budgeting. Defs.' Resp. 32–33.  Second and relatedly, the cancellation or lengthy delay of the Rights Offering could impact the company's standing in the market, frustrate settled expectations, and diminish the capital return on the transaction if and when it does eventually go forward. *Id.* Although Plaintiff could reasonably retort that these anticipated injuries are speculative, they are hardly more so than his own claims of irreparable injury; at any rate, it would be difficult for us to say the balance tilts heavily toward one side or the other.

Plaintiff's cursory argument that the "public interest" counsels an injunction does not fare any better. Citing the Dodd-Frank Act, Plaintiff contends that "the public interest in having corporations managed for the benefits of stockholders and not for the self-interest of directors is paramount." Pl.'s Mot. 9 (citing Wall Street Reform and Consumer Protection Act, Pub.L. 111–203, H.R. 4173). Defendants' point in response to the interests of the third-party public that could be negatively impacted by an injunction—namely, the participants in the 80,000 trades of rights on the open market that had taken place as of early September. Defs.' Resp. 33. At a higher level of generality, the "strongly pro-management version of the business judgment rule" contained in Indiana's Business Corporation Law reflects the state's policy judgment that the general interest is best served by deferring to boards' decisions absent strong evidence of misconduct. Ind. Code § 23-1-35-1(e); *G & N Aircraft,* 743 N.E.2d at 238.

Plaintiff urges us several times in his briefs to consider the Rights Offering in the larger context of the BH board's other allegedly improper transactions, arguing that only when situated within a pattern of entrenching behavior can it be seen for its true nature. *See, e.g.,* Pl.'s Reply 9. As well-taken as this suggestion may be when considering Plaintiff's underlying complaint, it underlines the weakness of claim for injunctive relief here. If the pernicious effect of the Rights

Offering derives from its status as the latest in a series of iniquities perpetrated by Biglari and his allies upon the corporate interest, it becomes difficult to see why this transaction alone warrants the extraordinary remedy of an injunction. Without foreclosing the possibility that Plaintiff may succeed in further substantiating his allegations as to the merits of his claims as a whole, we conclude that he has fallen well short of demonstrating the need to enjoin the Rights Offering. Accordingly, Plaintiff's Motion for Preliminary Injunction is DENIED.

IT IS SO ORDERED.

Date: _____09/12/2013_____

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

22

Distribution:


David K. Herzog
FAEGRE BAKER DANIELS LLP - Indianapolis
david.herzog@faegrebd.com

Harmony A. Mappes
FAEGRE BAKER DANIELS LLP - Indianapolis
harmony.mappes@faegrebd.com

Paul A. Wolfla
FAEGRE BAKER DANIELS LLP - Indianapolis
paul.wolfla@faegrebd.com
GLANCY BINKOW & GOLDBERG LLP
lboyarsky@glancylaw.com

Linda L. Vitone
KATZ & KORIN P.C.
lvitone@katzkorin.com

Offer  Korin
KATZ & KORIN P.C.
okorin@katzkorin.com

Christopher J. Clark
LATHAM & WATKINS, LLP
christopher.clark2@lw.com

James Christian Word
LATHAM & WATKINS, LLP
christian.word@lw.com

Avraham Noam Wagner
THE WAGNER FIRM
avi@thewagnerfirm.com