UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| IN RE BIGLARI HOLDINGS, INC. | ) | CONSOLIDATED |
| SHAREHOLDER DERIVATIVE | ) | No. 1:13-cv-00891-SEB-MJD |
| LITIGATION | ) | |

## ORDER ON DEFENDANTS' MOTION TO DISMISS

This cause is before the Court on Defendants' motion to dismiss Plaintiff Chad R.

Taylor's Amended Complaint [Docket No. 113], filed on March 31, 2014 pursuant to Federal

Rule of Civil Procedure 12(b)(6). Since the filing of Defendants' motion, the Court has

consolidated the cases of *Taylor v. Biglari et al.* (1:13-cv-00891-SEB-MJD) and *Donahue v.*

*Biglari et al.* (1:14-cv-00025-SEB-DML), both shareholder derivative suits brought against the

six board members of Biglari Holdings, Inc., into a single action. Docket No. 124. The Amended

Complaint in *Taylor v. Biglari* [Docket No. 107] serves as the operative complaint in the

consolidated action. For the reasons set forth below, Defendants' motion to dismiss must be and

therefore is GRANTED.

## Factual and Procedural Background

Biglari Holdings, Inc. ("BH") is an Indiana holding company whose assets include two

restaurant chains, Western Sizzlin and Steak n Shake. ¶ 27.[1] Plaintiffs Chad R. Taylor and

Edward Donahue are BH shareholders. ¶ 26.[2]

---

[1] Citations to paragraph numbers in this summary of the facts refer to the Amended Complaint [Docket No. 107].
[2] This motion to dismiss concerns the operative Amended Complaint filed by Plaintiff Chad R. Taylor. Although the matter is now consolidated, we refer to "Plaintiff" in the singular for the purposes of our ruling on this motion.

This suit is primarily concerned with the actions of BH's namesake, Defendant Sardar Biglari ("Biglari"), who has served as the chairman of the company's board of directors since June 2008 and as its CEO since August 2008. ¶ 29. In 2000, Biglari founded Biglari Capital Corporation (BCC), which in turn was the sole general partner in the Lion Fund, an investment venture and hedge fund. *Id.* Among the other investments Biglari has made in the last decade through these vehicles, he has sought and acquired a controlling interest in the two restaurant chains referenced above. By August 2005, Biglari had acquired a sufficient stake in the 40-year-old, financially struggling Western Sizzlin chain to have himself appointed to the company's board. ¶ 53. Within another year, Biglari had increased his share of the company's stock to 43%, and had been named the company's CEO. ¶ 54. He then turned his investment attention to Steak n Shake, where by August 2007 he had obtained a 5.8% ownership stake. Shortly thereafter, in March 2008, he prevailed in a proxy fight, and the company's shareholders voted him, and co-Defendant Philip Cooley, onto the board. Biglari was subsequently named CEO in August 2008—a position he continues to hold. ¶¶ 58–59.

In August 2009, the two companies consolidated under Biglari's leadership as Steak n Shake acquired Western Sizzlin for a premium of 7% above market value; the board of the combined companies later passed a 20-for-1 "reverse stock split," increasing the entity's share price from $13 to $360 a share. ¶¶ 65–68. On April 8, 2010, the consolidated company changed its name to Biglari Holdings, Inc. ("BH"). ¶ 70. In a deal announced the same month, BH acquired BCC, the general partner of Biglari's investment vehicle, the Lion Fund. BH bought BCC for the nominal price of $1 plus an amount equal to BCC's capital base, estimated at the time to be $4.75 million; the buyout was also contingent upon shareholder approval of a new compensation package for Biglari consisting of a $900,000 annual salary as well as annual

incentive payments based on the company's book value growth. ¶ 72. This package, in modified form, did receive shareholder approval in November 2010. ¶ 74.

The current members of the BH board are Sardar Biglari, Phillip L. Cooley, Kenneth R. Cooper, Dr. Ruth J. Person, William L. Johnson, and James P. Mastrian. ¶¶ 29–36. The latter four directors also constitute the board's Governance, Compensation, and Nominating Committee. Clark Decl., Ex. 8 at 33. All five members of the board other than Biglari have professional ties to him that extend outside their joint service on the BH board; these contacts include involvement with Biglari's Lion Fund, service on the predecessor Western Sizzlin board, joint service on outside boards, and—in the case of Philip Cooley—a previous professor-student relationship. *Id*. Plaintiff alleges that the members of the board and GCN Committee approved three transactions in 2013—what he calls the "Entrenchment Transactions"—that improperly benefitted Biglari personally rather than the broader corporate interest their fiduciary duties bound them to safeguard. Pl.'s Mot. 3–4. These three transactions give rise to the derivative claims.

The company announced the first of these disputed deals, the Licensing Agreement, in January 2013. Under its terms, Biglari granted to BH an "exclusive license to use the name and mark Biglari" in connection with the company's businesses; the license extends for 20 years, and it is royalty-free unless a "triggering event"—such as a change in corporate control or Biglari's termination as CEO without cause—occurs. ¶ 75. In the event that the royalties provision is triggered, BH will owe Biglari for five years a sum equal to 2.5% of the company's revenue for that year. Based on 2012 numbers, BH's annual obligation would be $17.5 million out of a net operating income of $38.82 million. ¶ 76. In an SEC filing, the company acknowledged that the Licensing Agreement, together with other parts of Biglari's incentive package, could deter a

change of corporate control: "The combination of these provisions along with others referenced (e.g., contracts cancellable if Mr. Biglari is no longer Chairman and CEO) altogether could have the effect of preventing a transaction involving a change of control of the Company or deterrence of a potential proxy contest." ¶ 82.

In the second challenged transaction, BH sold BCC—which it had bought from Biglari three years prior—back to Biglari in July 2013. In doing so for a price of $1.7 million, Plaintiff contends that the GCN Committee ignored the recommendations of an outside valuation firm that had pegged the fund's value at the significantly higher sum of $8.8–10.2 million. Pl.'s Resp. 6–7 (citing Am. Compl. ¶ 87). Before the sale took place, however, BCC had already "distributed to the company substantially all of BCC's partnership interests in the Lion Fund [totaling approximately $5.8 million]" and retained solely a $100,000 general partner interest in the Lion Fund at the time of the deal. According to Defendants, this earlier transaction—coupled with the committee's efforts to take into account the effect the sale of BCC would have on its financial obligations to Biglari himself—explains the discrepancy between the sale price and the outside firm's appraisal of BCC's value, which did not take into account these considerations. Defs.' Br. 16–18. Additionally, in connection with the deal, the company stated publicly that it would continue to employ the funds associated with BCC as its primary investment vehicle; in the agreements attendant to this sale and the creation of the Lion Fund II (a new fund in which BCC is the general partner), the company committed approximately $326 million in securities, which are subject to a five-year "lock up" period. ¶¶ 84–85.

The final "entrenchment transaction" at issue is the 2013 Rights Offering, first disclosed by BH in a Form S-3 Registration Statement on February 5, 2013. ¶ 90. A rights offering is a corporate stock device for raising capital, whereby a corporation issues a number of "rights" to

existing shareholders, entitling them—if they choose to invest the additional capital required for their exercise—to convert these rights into additional shares of stock. If the rights offering is not fully subscribed by the existing shareholders, other shareholders who have exercised these rights may then "oversubscribe," meaning they can acquire the shares not taken. The "rights" are distributed evenly in proportion to existing ownership shares (at 5 rights per share), and may be traded on the open market. As originally announced, the Offering aimed to raise approximately $50 Million for the company. On August 6, 2013, the board made a final announcement of the details of the Rights Offering, in which prices were set and the capital target was raised to approximately $75 Million. The Rights Offering commenced on August 27, 2013, and it raised in excess of $75 million in new capital for BH; Plaintiff contends that Biglari "and his affiliates" increased their ownership share of the company from 15.4% to 16.1% as a result of the oversubscription option. Def.'s Br. 19; Am. Compl. ¶ 95.[3]

On June 3, 2013, Plaintiff Chad R. Taylor filed a shareholder derivative complaint against BH as a nominal defendant and the six board members as individual defendants, alleging that the "entrenchment transactions" and other board actions have violated the members' duty to the corporate interest. Docket No. 1. In August 2013, Plaintiff moved to enjoin the Rights Offering, which was then not yet complete; the Court denied that motion on September 12, 2013. Docket No. 69. Plaintiff's Amended Complaint, filed on March 10, 2014, charges the individual defendants with breach of their fiduciary duty, gross mismanagement, abuse of control, and waste of corporate assets; it seeks rescission of some of the disputed transactions, disgorgement of "illicit shares and profits," recovery of damages to the company, and certain changes to the company's governance and articles of incorporation. Docket No. 107.

---

[3] The descriptions of the Rights Offering in this paragraph are taken from the Court's Order of September 12, 2013 denying Plaintiff's motion to enjoin the Rights Offering. *See* Docket No. 69 at 3–4.

# Legal Analysis

## Standard of Review

Federal Rule of Civil Procedure 12(b)(6) authorizes dismissal of claims for "failure to state a claim upon which relief may be granted." Fed. R. Civ. P. 12(b)(6). In determining the sufficiency of a claim, the court considers all allegations in the complaint to be true and draws such reasonable inferences as required in the plaintiff's favor. *Jacobs v. City of Chi.,* 215 F.3d 758, 765 (7th Cir. 2000). Federal Rule of Civil Procedure 8(a) applies, with several enumerated exceptions, to all civil claims, and it establishes a liberal pleading regime in which a plaintiff must provide only a "short and plain statement of the claim showing that [he] is entitled to relief," Fed. R. Civ. Pro. 8(a)(2); this reflects the modern policy judgment that claims should be "determined on their merits rather than through missteps in pleading." *E.E.O.C. v. Concentra Health Servs., Inc.*, 496 F.3d 773, 779 (7th Cir. 2007) (citing 2 James W. Moore, et al., *Moore's Federal Practice* § 8.04 (3d ed. 2006)). A pleading satisfies the core requirement of fairness to the defendant so long as it provides "enough detail to give the defendant fair notice of what the claim is and the grounds upon which it rests." *Tamayo v. Blagojevich*, 526 F.3d 1074, 1083 (7th Cir. 2008).

In its decisions in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the United States Supreme Court introduced a more stringent formulation of the pleading requirements under Rule 8. In addition to providing fair notice to a defendant, the Court clarified that a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). Plausibility requires more than labels and conclusions, and a "formulaic recitation of the elements of a cause of action will not do." *Killingsworth v. HSBC*

*Bank Nevada, N.A.*, 507 F.3d 614, 618 (7th Cir. 2007) (quoting *Twombly,* 550 U.S. at 555). Instead, the factual allegations in the complaint "must be enough to raise a right to relief above the speculative level." *Id.* The plausibility of a complaint depends upon the context in which the allegations are situated, and turns on more than the pleadings' level of factual specificity; the same factually sparse pleading could be fantastical and unrealistic in one setting and entirely plausible in another. *See In re Pressure Sensitive Labelstock Antitrust Litig.*, 566 F. Supp. 2d 363, 370 (M.D. Pa. 2008).

Although *Twombly* and *Iqbal* represent a new gloss on the standards governing the sufficiency of pleadings, they do not overturn the fundamental principle of liberality embodied in Rule 8. As this Court has noted, "notice pleading is still all that is required, and 'a plaintiff still must provide only enough detail to give the defendant fair notice of what the claim is and the grounds upon which it rests, and, through his allegations, show that it is plausible, rather than merely speculative, that he is entitled to relief.'" *United States v. City of Evansville*, 2011 WL 52467, at *1 (S.D. Ind. Jan. 8, 2011) (quoting *Tamayo*, 526 F.3d at 1083). On a motion to dismiss, "the plaintiff receives the benefit of imagination, so long as the hypotheses are consistent with the complaint." *Sanjuan v. Am. Bd. of Psychiatry & Neurology, Inc.*, 40 F.3d 247, 251 (7th Cir. 1994).

## Discussion

The sole ground upon which Defendants seek dismissal is Plaintiff's failure to "plead particularized facts excusing Plaintiff's failure to make a pre-suit demand on BH's Board of Directors." Docket No. 113. We address, in turn, the standard governing a "demand futility" claim and the applicability of the standard to Plaintiff's allegations here.

## I.     The *Aronson* standard

Under Indiana law, a plaintiff in a shareholder derivative suit must satisfy certain threshold requirements in order for her claim to be considered. A plaintiff must show (1) that she was a shareholder at the time of the transaction of which she complains, (2) that she made efforts to obtain the requested action from the board of directors—or why she did not make demand on the board, and (3) that she fairly and adequately represents the interests of the shareholders as a whole. Ind. Code § 23-1-32-1; Ind. Trial Rule 23.1. The second criterion, the "demand" requirement, reflects the law's general attitude of deference towards the decisions made by a corporation's directors, as embodied in the "business judgment rule"—a presumption that in making a business decision, "the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *G & N Aircraft, Inc. v. Boehm,* 743 N.E.2d 227, 238 (Ind. 2001) (citing *Aronson v. Lewis,* 473 A.2d 805, 812 (Del. 1984)). Indiana has adopted a "strongly pro-management" version of the Business Judgment Rule, *see G & N Aircraft,* 743 N.E.2d at 238, expressing its policy that "the decision whether and to what extent to investigate and prosecute claims . . . should in most instances be subject to the judgment and control of the board." Ind. Code § 23-1-32-4(b).

The demand requirement is thus a "substantive right of the shareholder and the directors" in addition to a procedural standard; federal courts considering shareholder derivative suits therefore apply the law of the company's state of incorporation to determine "what excuses are adequate for failure to make demand." *In re Abbott Labs. Derivative S'holders Litig.*, 325 F.3d 795, 804 (7th Cir. 2003) (citing *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 98–99 (1991)). Because Indiana's guidelines for "demand futility" are neither enumerated by statute nor explained in commentary, *In re Guidant S'holders Derivative Litig.*, 841 N.E.2d 571, 573 (Ind.

2006), Indiana courts rely on the well-developed body of Delaware law on the subject. *In re ITT Derivative Litig.*, 932 N.E.2d 664, 668 (Ind. 2010); *G & N Aircraft,* 743 N.E.2d at 238.

When a plaintiff challenges the actions taken by a board of directors, as here, Delaware law measures demand futility according to the two-part test derived from *Aronson v. Lewis,* 473 A.2d 805 (Del. 1984), *overruled on different grounds by Brehm v. Eisner*, 748 A.2d 244 (Del. 2000). A later Delaware decision summarizes the standard as follows:

> The test of demand futility is a two-fold test under *Aronson* and its progeny. The first prong of the futility rubric is "whether, under the particularized facts alleged, a reasonable doubt is created that ... the directors are disinterested and independent." The second prong is whether the pleading creates a reasonable doubt that "the challenged transaction was otherwise the product of a valid exercise of business judgment." These prongs are in the disjunctive. Therefore, if either prong is satisfied, demand is excused.

*Brehm,* 746 A.2d at 256. *See also Westmoreland Cnty. Emp. Ret. Sys. v. Parkinson,* 727 F.3d 719, 725 (7th Cir. 2013) (applying Delaware law). The test is in the disjunctive: "if either prong is satisfied, demand is excused." *Westmoreland,* 727 F.3d at 725 (quoting *Brehm,* 746 A.2d at 256).

Noting that "demand is excused whenever the business judgment rule does not apply to the board decision at issue," Plaintiff contends that, given the nature of the allegations here, the Board's conduct should receive the heightened scrutiny of "entire fairness" review. Pl.'s Resp. 17 (citing *Aronson,* 473 A.2d at 808). Accordingly, urges Plaintiff, the Defendants bear the burden of demonstrating that "the transactions at issue are entirely fair to the Company's shareholders." *Id.*

Plaintiff's argument misunderstands the dual role of the business judgment rule as applied to the demand requirement. Just as the rule creates a rebuttable presumption that the actions of a company's board of directors are taken in the company's interests, so does the

demand requirement embody a similar presumption that a board will act in the company's best interests in weighing whether to pursue a derivative suit. While the rule itself is a substantive legal standard, however, the demand requirement doubles as a procedural screen. *See In re Abbott,* 325 F.3d at 804. Plaintiff's mistake here is to attempt to graft the concept of "entire fairness" scrutiny—which applies when a board's conflict of interests has removed its entitlement to business judgment rule deference—onto the antecedent question of demand futility. *See generally Wood v. Baum,* 953 A.2d 136, 142 (Del. 2008). The landmark Delaware Supreme Court decision in *Weinberger v. UOP, Inc.,* 457 A.2d 701 (Del. 1983), established that "where one stands on both sides of a transaction, he has the burden of establishing its entire fairness, sufficient to pass the test of careful scrutiny by the courts." 457 A.2d at 710. But that precedent, like all the other decisions cited by Plaintiff on this point, is inapposite to the posture of this case. *Cf., e.g., In re Guidant Corp. S'holders Deriv. Litig.*, 2006 WL 290524 (S.D. Ind. Feb. 6, 2006) (addressing a motion for injunctive relief rather than demand futility); *Orman v. Cullman,* 794 A.2d 5, 20 (Del. Ch. 2002) (discussing the business judgment rule outside the context of a shareholder derivative suit and the demand requirement).[4] Regardless of what standards may govern judicial review of the substance of a challenged transaction, we must dismiss Plaintiff's suit unless he can establish that his failure to make demand on the BH board was excused. *See Mitchell ex rel. Broadwin Energy, Inc. v. Reiland,* 2012 WL 1755677, at *4 (N.D. Ill. May 15, 2012) (noting that "[t]he [entire fairness] standard is not used . . . to evaluate whether a board . . . wrongfully refused a shareholder demand the corporation bring suit"); *In re Chrysler Corp. S'holders Litig.*, 1992 WL 181024, at *4–5 & n.3 (Del. Ch. July 27, 1992)

---

[4] Plaintiff cites a number of additional cases, and one secondary source, in his Response brief. We need not address them all by name to note that they do not address the demand requirement or stand for the proposition that *Aronson* is inapplicable to a case like the one before us. *See* Pl.'s Resp. 17–18.

(rejecting a plaintiff's effort to confuse the *evidentiary* burden that might be borne by the defendants on the merits with the pleading burden borne by plaintiffs).

The *Aronson* demand futility test, moreover, is designed to account for those circumstances in which deference to a board's business judgment is inappropriate. As we have noted in a previous opinion, the outcome of the two-pronged test almost invariably prefigures the court's resolution of the underlying claim: if on the first prong a majority of the board is compromised by conflicts of interest or lacks independence, then its decisions will likely be invalidated under the stringent "entire fairness" standard governing interested transactions. *See, e.g., Weinberger,* 457 A.2d at 710. Similarly, if a court decides the second *Aronson* prong in favor of a plaintiff, then it has thereby concluded that the transactions challenged are so arbitrary or deficient that they fail to meet even the deferential scrutiny of the substantive business judgment rule. Docket No. 69 at 15; *Starrels v. First Nat'l Bank of Chicago,* 870 F.2d 1168, 1172–1174 (7th Cir. 1989) (Easterbrook, J., concurring).

We now apply the *Aronson* test to the allegations contained in Plaintiff's Amended Complaint.

## II.  *Aronson* **Prong One – Board's Interest or Lack of Independence**

Demand may be excused under the first prong of the *Aronson* test if a plaintiff can show that a majority of a board's directors are either compromised by interest in the board's challenged conduct or lack sufficient independence to consider a demand on its merits. *In re Abbott,* 325 F.3d at 807.[5]

---

[5] Plaintiff also argues that the board should be considered "interested" because its directors have a high likelihood of personal liability and thus have an incentive to refuse demand. Defendants note, as an initial matter, that a plaintiff cannot baldly assert that directors are likely to be personally liable, without evidentiary support, as a means of disqualifying them from considering demand. "[I]t is well established that the simple expedient of naming a majority of otherwise disinterested and well motivated directors as defendants and charging them with laxity or conspiracy, etc., will not itself satisfy the standards for permitting a shareholder to be excused from demand or to override a board decision not to litigate a corporate claim." *Gagliardi v. TriFoods Int'l, Inc.*, 683 A.2d 1049, 1055 (Del. Ch.

**A. Improper Interest**

A director has impermissible self-interest "whenever divided loyalties are present, or a director has received, or is entitled to receive, a personal financial benefit from the challenged transaction which is not equally shared by the stockholders." *Rales v. Blasband,* 634 A.2d 927, 932 (Del. 1993). In order to establish director "interest" sufficient to excuse demand, a plaintiff must generally allege particularized facts showing that a majority of the board or decision-making body had either (1) a financial interest not equally shared by the stockholders, or (2) an entrenchment purpose. *Grobow v. Perot,* 539 A.2d 180, 188 (Del. 1988), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000); *Feldman v. Cutaia,* 2006 WL 920420, at *6 (Del. Ch. Apr. 5, 2006).[6]

Neither party disputes that Sardar Biglari himself was "interested" in at least two of the three principal transactions at issue; with respect to the Licensing Agreement and the BCC sale, he "receive[d] a personal financial benefit from a transaction that [was] not equally shared by the stockholders." *See Rales,* 634 A.2d at 936; *Conrad v. Blank,* 940 A.2d 28, 38 (Del. Ch. 2007) (noting that "two directors who allegedly received backdated option . . . are clearly not disinterested"). Plaintiff has not alleged, however, that any of the five other directors stood on both sides of the challenged transactions or stood to realize personal gain from them. Because he

1996) (citing *Pogostin v. Rice,* 480 A.2d 619, 625 (Del. 1984)). At any rate, the board that would consider demand here is the same board that approved the challenged transactions. We can therefore address the question of whether board members face a "substantial likelihood" of liability for violations of their fiduciary duty, *see Seminaris v. Landa,* 662 A.2d 1350, 1354 (Del. Ch. 1995), in conjunction with our review of the transactions themselves under *Aronson* prong two. We conclude below that Plaintiff has not satisfied the second prong of the *Aronson* test; it would frustrate the entire purpose and structure of the two-part test to allow prong one to serve as a backdoor inquiry—at a lower level of scrutiny—into the propriety of the board's business decisions.

[6] The Governance, Compensation, and Nominating (GCN) Committee, whose decisions are primarily at issue here, is composed of Defendants Cooper, Johnson, Mastrian, and Person. *See* Clark Decl., Ex. 8 at 33. A conclusion that these four members constituted a disinterested and independence majority of the board as a whole—which we reach below—thus compels the conclusion that a majority of the GCN committee was disinterested and independent as well.

alleges that only one director's vote was tainted by financial self-interest, he cannot show that demand is excused on this ground. *See In re Abbott,* 325 F.3d at 807 (citing *In re Gen. Instr. Corp. Sec. Litig.*, 23 F. Supp. 2d 867, 874 (N.D. Ill. 1998)) ("Nor . . . have plaintiffs presented allegations that any of the other directors profited in any way by their actions, or lack thereof.").

Plaintiff argues instead that the other board members were improperly interested not in direct financial gain, but in entrenching Biglari and themselves on the board. "To plead entrenchment, the complaint must allege facts sufficient to demonstrate that the 'sole or primary purpose' of the challenged board action was to perpetuate the directors in control of the corporation.'" *Green v. Phillips,* 1996 WL 342093, at *4 (Del. Ch. June 19, 1996) (citing *Kahn v. Roberts,* 1994 WL 70118, at *6 (Del Ch. Feb. 28, 1994)); *Frantz Mfg. Co. v. EAC Indus.,* 501 A.2d 401, 408 (Del. 1985). According to Plaintiff, the Licensing Agreement is an "entrenching device that is not designed to compensate S. Biglari for use of his mark but rather to ensure that his position at the Company will not be disturbed." Pl.'s Resp. 23 (citing *In re Gaylord Container Corp. S'holders Litig.*, 747 A.2d 71, 84 (Del. Ch. 1999)). Plaintiff also alleges that the Rights Offering, which enabled Biglari to increase incrementally his BH ownership share, Am. Compl. ¶ 7, was aimed at consolidating his position on the board. "Each of the 2013 Entrenchment Transactions which Defendants taken must not be viewed in a vacuum," contends Plaintiff; all the transactions "represent[] S. Biglari and the Board's decisions to entrench their positions within BH and ensure that it is unreasonably difficult for any shareholder who disagrees with their self-serving policies to challenge them." Am. Compl. ¶ 19.

It is more than plausible that the 2013 transactions had the effect of strengthening the incumbent BH board's position. The company itself admitted in an SEC disclosure that the Licensing Agreement, in particular, "could have the effect of preventing a transaction involving

a change of control of the Company or deterrence of a potential proxy contest." Am. Compl. ¶ 82. Allegations of an entrenchment motive have been found insufficient to excuse demand, however, where a plaintiff has not pleaded any facts showing that the directors' positions were actually threatened at the time they took the challenged actions. *See Grobow,* 539 A.2d at 188, *overruled on other grounds by Brehm,* 746 A.2d 244; *Spillyards v. Abboud,* 662 N.E.2d 1358, 1367 (Ill. App. Ct. 1996) (applying Delaware law and *Grobow*). *Cf. Unocal Corp. v. Mesa Petroleum Co.,* 493 A.2d 946, 955–957 (Del. 1985) (applying heightened scrutiny to board actions taken in the shadow of threatened takeover). While the three 2013 transactions might all have strengthened Biglari's *individual* position, it would be too great a leap to read them as aimed predominantly at the *board's* entrenchment. In the absence of any particularized facts tending to show that the primary or sole purpose of the majority of board members was to entrench themselves, we cannot conclude that the demand requirement is excused on this basis. *See Green,* 1996 WL 342093, at *4 ("[T]he complaint pleads no facts demonstrating an *actual* threat to the directors' positions . . . . The complaint also fails to allege facts that would show that the directors' sole or primary motivation . . . was to perpetuate themselves in control.").

**B. Lack of Independence**

A director lacks independence when his decisions are based on "extraneous considerations or influences" rather than the "corporate merits of the subject." *In re Abbot,* 325 F.3d at 807. One such impermissible extraneous influence arises where a director is "beholden" to another interested director or corporate officer through a personal relationship or otherwise excessive influence. *See Rales,* 634 A.2d at 936.

Plaintiff alleges broadly that Sardar Biglari so dominates the board that its decisions are mere rubber stamps for his wishes. In support of this theory, Plaintiff cites Biglari's dual position

as CEO and chairman, his "authority to make all investment and capital allocation decisions on behalf of the Company," and his alleged ability to "handpick" and remove directors at will. Am. Compl. ¶¶ 29, 61, 97–100. Plaintiff also claims that each of the five other board members has sufficiently close personal or professional ties to Biglari to subvert his or her independence.

These allegations are insufficient to raise a reasonable doubt that a majority of the board lacks independence. As an initial matter, the fact that Biglari is CEO of the company—or that he controls nearly 17% of the corporation's stock—is not itself proof that board members are subservient to him. *See Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart,* 845 A.2d 1040, 1051 (Del. 2004) (noting that Martha Stewart's 94% voting power in her eponymous company, even when coupled with her other social ties to board members, was "insufficient, without more, to rebut the presumption of [the board's] independence"). Similarly, the allegation that Biglari "handpicked" the five other board members—even if proven—would not meet Plaintiff's burden. "Of course, the law is well-settled that [the CEO]'s involvement in selecting each of the directors is insufficient to create a reasonable doubt about their independence." *White v. Panic,* 793 A.2d 356, 366 (Del. Ch. 2000) (citing *Aronson,* 473 A.2d at 816). *See also In re Walt Disney Co. Derivative Litig.*, 731 A.2d 342, 359–360 (Del. Ch. 1998), *overruled on other grounds by Brehm,* 746 A.2d 244; *Kaufman v. Belmont,* 479 A.2d , 287–288 (Del. Ch. 1984).

As for the individual directors' ties to Biglari, Plaintiff's allegations fail to create doubt regarding the independence of majority of the board. As Defendants implicitly concede, Defendant Philip Cooley has extensive personal ties with Biglari, dating back more than a decade to his time as Cooley's professor at Trinity University. Am. Compl. ¶ 32. Delaware courts have found that a director lacks independence where he or she has a "close personal or familial relationship" with an interested director. *See Orman,* 794 A.2d at 25 n.50; *Chesapeake*

*Corp. v. Shore,* 771 A.2d 293, 299 (Del. Ch. 2000). While Plaintiff has therefore created a reasonable doubt as to Cooley's independence, he is unable to do so with respect to the remaining four of the six BH directors.

As for Defendants Kenneth Cooper and James Mastrian, Plaintiff alleges that each had previously served on a different corporate board with Biglari before their joint service on the BH board[7]; Plaintiff also alleges that Cooper has been an investor in the Lion Fund.[8] Am. Compl. ¶¶ 111, 113. Allegations that "an interested director and other directors move in the same business circles" are not enough to rebut the presumption of directors' independence. *See In re Verisign, Inc. Derivative Litig.*, 531 F. Supp. 2d 1173, 1198 (N.D. Cal. 2007) (applying Delaware law) (citing *Beam,* 845 A.2d at 1051–1052). Nor does the fact that two directors served with Biglari on other boards, by itself, support an inference that they are subject to Biglari's domination. As the D.C. Circuit has explained in rejecting allegations of director subservience based on similar allegations:

> The basic hurdle for plaintiffs stems from the fact that the kinds of relationships alleged in the complaint exist at many companies. Directors tend to be experienced and accomplished business persons; those individuals also tend to be comparatively wealthy and have a wide range of professional and charitable affiliations and relationships. It is usually considered in the interests of corporations and their shareholders to attract experienced and accomplished business leaders as directors. So as not to preclude service by such persons, Delaware law creates a very high bar for using the kinds of relationships alleged here as a basis for finding a lack of independence and thereby excusing demand in a derivative suit.

---

[7] Specifically, Plaintiff asserts that Mastrian served with Biglari on the CCA Industries board, and that Cooper served with Biglari on the board of Western Sizzlin (before its acquisition by Steak n Shake) from 2007 to 2010. Am. Compl. ¶¶ 111, 113.

[8] While BH has invested in the Lion Fund(s), the company's transactions have directly involved only BCC—which is the Lion Funds' general partner. Plaintiff makes no particularized allegations that Defendant Cooper had financial self-interest in any of these transactions.

*Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust ex rel. Fed. Nat'l Mortg. Ass'n v. Raines,* 534 F.3d 779, 793–794 (D.C. Cir. 2008). *See also Caviness v. Evans,* 229 F.R.D. 354, 361 (D. Mass. 2005) (applying Delaware law); *In re IAC/InterActiveCorp Securities Litig.*, 478 F. Supp. 2d 574, 601–603 (S.D.N.Y. 2007) (applying Delaware law).

With respect to Defendant director Ruth Person, Plaintiff alleges that she lacks independence because she will shortly step down from her position as chancellor of the University of Michigan-Flint, and she will therefore be financially dependent on her salary as a director—and thus, Plaintiff assumes, on Sardar Biglari's goodwill. Am. Compl. ¶ 112. Where a plaintiff alleges that a director lacks independence because of a disabling financial entanglement, he or she must show that the interest "was of a sufficiently material importance, in the context of the director's economic circumstances, as to have made it improbable that the director could perform her fiduciary duties to the [shareholders] without being influenced by her overriding personal interest." *See In re Gen. Motors Class H S'holders Litig.*, 734 A.2d 611, 617 (Del. Ch. 1999). Courts have consistently resisted suggestions, of course, that a director's receipt of payment for service on a board renders her unable to discharge her fiduciary duties independently. *See White,* 793 A.2d at 366 (Del. Ch. 2000). Mere speculation about Person's personal finances in the wake of her resignation from another position is wholly insufficient to create an exception to this common-sense rule. *Cf. In re Infousa, Inc.*, 2007 WL 3325920, at *8 (Del. Ch. Aug. 13, 2007) (finding demand excused where a university professor who served on a board received a *personal grant* from the CEO).[9]

---

[9] Plaintiff also alleges that director William Johnson lacks independence because he formerly served on the board of an insurance company that was the target of an unsuccessful takeover bid by Biglari. "Now, with the benefit of Johnson's insurance experience," the Amended Complaint asserts, "Biglari continues to branch out into the insurance industry." Am. Compl. ¶ 110. Apart from the bare speculation that Johnson and Biglari are in league now (or ever were in the past), the fact that Johnson once served on the board of a company Biglari tried and failed to take over hardly raises a reasonable doubt regarding his independence.

Because Plaintiff has not pleaded particularized facts giving rise to a reasonable doubt about the disinterestedness or independence of four of the six directors—Person, Johnson, Mastrian, and Cooper—he has failed to show that demand was futile under prong one of the *Aronson* test.

### III. *Aronson* **Prong Two – Transactions Entitled to Business Judgment Rule Deference**

Under the second prong of the *Aronson* test, a plaintiff can show that demand is excused if the underlying transaction in question is not entitled to the protections of the business judgment rule. As the Seventh Circuit has explained, this entails an inquiry into "both the substantive due care (substance of the transaction) as well as the procedural due care (an informed decision) used by the directors." *In re Abbott,* 325 F.3d at 808 (citing *Starrels*, 870 F.2d at 1171).[10] A plaintiff seeking to excuse demand via the second prong of the *Aronson* test faces a steep uphill climb: "Approval of a transaction by a majority of independent, disinterested directors almost always bolsters a presumption that the business judgment rule attaches to transactions approved by a board of directors that are later attacked on grounds of lack of due care. In such cases, a heavy burden falls on a plaintiff to avoid pre-suit demand." *Grobow,* 539 A.2d at 190. The test functions as an "escape hatch"—a vehicle to allow a finding of demand futility in those rare cases when a board's decision-making process, or the challenged transaction itself, is so "egregious on its face" that it cannot have resulted from the proper exercise of a board's fiduciary duties. *See Aronson,* 473 A.2d at 815. To meet this test, the decision approving the challenged transaction must be "so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith." *In re J.P. Stevens & Co.*

---

[10] As the Delaware courts have recognized, the concept of "substantive due care" is a misnomer. "Due care in the decisionmaking context is *process* due care only. Irrationality is the outer limit of the business judgment rule. Irrationality may be the functional equivalent of the waste test or it may tend to show that the decision is not made in good faith, which is a key ingredient of the business judgment rule." *Brehm,* 746 A.2d at 264.

*S'holders Litig.*, 542 A.2d 770, 780–781 (Del. Ch. 1988). It is according to this exacting standard that we consider Plaintiff's allegations regarding the three challenged 2013 transactions.[11]

## A. The Licensing Agreement[12]

Plaintiff argues that in approving the Licensing Agreement with Sardar Biglari, the BH board violated both its procedural duty of due care and its substantive responsibility to refrain from corporate waste.

### 1. Due Care

Corporate directors owe their corporation a fiduciary duty to make informed decisions—a duty which imposes upon them an affirmative responsibility to "protect [the shareholders'] interests and to proceed with a critical eye." *Smith v. Van Gorkom,* 488 A.2d 858, 872 (Del. 1985) (citations omitted), *overruled on different grounds by Gantler v. Stephens,* 965 A.2d 695 (Del. 2009). *See also W & W Equip. Co. v. Mink,* 568 N.E.2d 564, 575 (Ind. Ct. App. 1991) ("A director cannot blindly take action and later avoid the consequences by saying he was not aware

---

[11] Plaintiff argues that we should consider the three transactions in tandem, because they were "part of a unitary entrenchment scheme designed to consolidate S. Biglari's control over the Company and remove any threat to his position as Chairman and CEO." Pl.'s Resp. 22. We have already considered Plaintiff's theory that the board engaged in a self-interested entrenchment scheme; we determined that the allegations were insufficient to warrant heightened scrutiny and remove the presumption of board disinterest. As for Plaintiff's broader contention that the transactions should be assessed as a whole, we decline to do so where the board approved them at separate times in separate votes, and where each was justified according to a distinct rationale. "In deciding whether to consider a sequence of transactions separately or collectively, the Court reviews the circumstances surrounding the challenged transactions, as alleged by the particularized facts of the complaint." *Cf. In re Nat'l Auto Credit, Inc. S'holders Litig.*, 2003 WL 139768, at *9 (Del Ch. Jan. 10, 2003) (considering transactions as a unit where the relevant resolutions were "adopted at the same meeting, within minutes of each other").

[12] As a threshold matter, Defendants argue that the Licensing Agreement cannot give rise to a derivative claim because Plaintiff has pleaded no injury to the corporation. Defs.' Br. 13–14. "BH has not spent a single dollar to obtain the beneficial use of Mr. Biglari's licenses and may never pay for them. Indeed, Plaintiff complains only that BH could be injured if certain events occur in the future." *Id.* at 13 (citing Am. Compl. ¶ 18). We cannot endorse such a broad conclusion with regard to ripeness. As the Delaware Court of Chancery noted in *Carmody v. Toll Brothers, Inc.*, 723 A.2d 1180 (Del. Ch. 1998), a corporate transaction creating the future potential of harm to a company can have a "*present* depressing and deterrent effect upon the shareholders' interests, in particular, the shareholders' *present* entitlement to receive and consider takeover proposals and to vote for a board of directors capable of exercising the full array of powers provided by statute." 723 A.2d at 1188 (emphasis original). As we have already noted above, the fact that the Licensing Agreement was not reached in the imminent shadow of a takeover bid is relevant to the level of scrutiny with which we review it; it does not mean, however, that a derivative claim is not even theoretically cognizable based on such an agreement.

of the effect of the action he took.") Under Delaware law, a plaintiff may establish demand

futility on grounds of a violation of this procedural duty of due care only by "plead[ing] facts

which would support a reasonable belief that the [board] act with gross negligence, i.e., that it

was uninformed in critical respects." *Grobow,* 539 A.2d at 190 (citing *Van Gorkom,* 488 A.2d at

873). Indiana law imposes a still heavier burden on plaintiffs: to overcome the business judgment

rule, a plaintiff must show that the directors of an Indiana corporation engaged in "recklessness

or willful misconduct." *In re ITT,* 932 N.E.2d at 670.

Here, Plaintiff alleges that the "board made no effort to assess the financial impact of the

Licensing Agreement to the Company." Am. Compl. ¶ 78. Further, it alleges that the intellectual

property attorney the board retained to consult on the matter improperly "shared her work" with

Biglari himself—and that Biglari also unilaterally added the Agreement's gross revenue payment

provision without any Board deliberation *Id.* at ¶¶ 5, 78. Plaintiff lastly quotes a corporate filing

to the effect that, other than a peer group study employed by the board's Governance,

Nominating, and Compensation (GCN) Committee in 2010, "no attempts were made to compare

the fairness of S. Biglari's compensation—Licensing Agreement included—to competitors

before adopting the Licensing Agreement." *Id.* at ¶ 79.

Plaintiff's allegations fall considerably short of rebutting Indiana's strong version of the

business judgment rule presumption. First, Defendants have shown that the Amended

Complaint's accusations or intimations of malfeasance are significantly overstated. With respect

to the email Biglari allegedly received from a non-board member sharing the outside IP

attorney's analysis of the Agreement with him, the message was sent *after* the GCN Committee

had approved the Agreement. *See* Am. Compl. Ex. 3. *See also* Docket No. 64-6. While another

email received by Biglari states that a draft of the gross revenue provisions of the Agreement

"reflects" Biglari's discussion with board member Kenneth Cooper, this statement hardly

supports an inference that Biglari himself dictated the Agreement's terms—or more importantly,

that there was any portion of the Agreement that was not discussed and voted upon by the full

GCN. *See* Am. Compl., Ex. 2 at BH-TAYLOR-00002954; Defs.' Br. 14–15. Second, Plaintiff

has not pleaded any facts consistent with the notion that the board abdicated its duties in the

manner in which it approved the Agreement. According to documents Plaintiff has attached to

his Amended Complaint, the GCN Committee's deliberation on the Agreement was informed by

a memorandum prepared by an outside firm; the memorandum summarized licensing royalty

rates in different fields and briefly discussed the nature of the Agreement. *See* Am. Compl., Ex. 3

at BH-TAYLOR-00002930–2931.

    As Defendants note, we have little knowledge of the details of the deliberative process

engaged in by the GCN Committee or the board; at the same time, however, Plaintiff's Amended

Complaint provides no basis for casting aside our deference to business judgment. There is no

indication here, for instance, that "material and reasonably available information was not

considered by the board." *Cf. McPadden v. Sidhu,* 964 A.2d 1262, 1271 (Del. Ch. 2008) (holding

demand futile under second *Aronson* prong where board tasked an outside entity to handle the

sale of a corporate unit when it should have known that the outside entity was actually interested

in *purchasing* the corporate unit and would accordingly undermine the process). Nor has Plaintiff

alleged that the committee's consideration of the proposal was perfunctory, or otherwise

procedurally deficient. *Cf. Sample v. Morgan,* 914 A.2d 647, 650–653 (Del. Ch. 2007) (finding

the protections of the business judgment rule inapplicable where a newly-formed committee

approved a compensation package for a CEO and others—that had been formulated by the CEO

himself in consultation with corporate counsel—in a meeting that lasted only 20 minutes). "Mere

allegations that directors made a poor decision . . . [do] not state a cause of action, much less meet the standard for excusing demand under the second prong of *Aronson*." *Ash v. McCall,* 2000 WL 1370341, at *10 (Del. Ch. Sept. 15, 2000). Plaintiff's allegations measure up to neither Delaware's high standards nor Indiana's still-higher ones with respect to the directors' due care in approving the Licensing Agreement.

## 2. Corporate Waste

Plaintiff also contends that, as a substantive matter, the Licensing Agreement was so harmful to the company as to constitute indefensible corporate waste. "The brand value in BH's assets lies in the Western Sizzlin and Steak n' Shake names[,] not S. Biglari. Even if there was value in the Biglari name, surely S. Biglari's compensation for use of the value should not be so significant that it decimates the company." Pl.'s Resp. 26.

A transaction is corporate waste—and thus a violation of a board's duty of "substantive" due care—if it constitutes a "transfer of assets for no consideration." *Emerald Partners v. Berlin,* 1993 WL 545409, at *6 (Del Ch. Dec. 23, 1993) (citing *Michelson v. Duncan,* 407 A.2d 211, 217 (Del. 1979)). Delaware courts excuse demand on the basis of waste only if the board has acted "on terms that no person of ordinary, sound business judgment could conclude represent[] a fair exchange." *Green,* 1996 WL 342093, at *5.

Regardless of our appraisal of the Agreement's wisdom, the facts alleged by Plaintiff are inconsistent with the theory that it "effectively constituted a gift." *See Ash,* 2000 WL 1370341, at *7. If we take the Agreement at face value, the royalty provisions were given in consideration of the company receiving a license to use and market the Biglari name. *See* Am. Compl. ¶¶ 75–76. Plaintiff protests that the license cannot possibly be worth the cost, reasoning that Sardar

Biglari's name lacks the cachet attached to a more widely-recognized corporate figure like

Martha Stewart.[13] Am. Compl. ¶ 80. But we do not second guess a board's cost-benefit analysis:

> [A] corporate waste claim must fail if "there is *any substantial* consideration received by the corporation" . . . . This is so even if the transaction appears, with hindsight, to be unreasonably risky to a reviewing court. As we have observed, "courts are ill-fitted to attempt to weigh the 'adequacy' of consideration under the waste standard or, *ex post,* to judge appropriate degrees of business risk."

*White v. Panic,* 783 A.2d 543, 554 (Del. 2001) (*quoting Brehm,* 746 A.2d at 263). *See also Ash,*

2000 WL 1370341, at *8; *Khanna v. McMinn,* 2006 WL 1388744, at *26 n.203 (Del. Ch. May 9,

2006). Contrary to Plaintiff's assertion, there is no pleaded *evidence* here, other than Plaintiff's

conclusion that a royalty of 2.5% is excessive, intimating "that the directors deliberately chose

that course of action knowing that [BH] was not financially strong enough to meet its

obligations"—and thus acted in bad faith. *Cf. Marwil v. Grubbs,* 2004 WL 2278751, at *9 (S.D.

Ind. Sept. 30, 2004).

Even if we read the Agreement as a thinly-disguised compensation package for Sardar

Biglari rather than a license, as Plaintiff invites us to do, the conclusion is the same. Our

"deference to directors' business judgment is particularly broad in matters of executive

compensation." *White,* 793 A.2d at 369 (Del. Ch. 2000) (citing *In re Walt Disney Co.,* 731 A.2d

at 362). "Sensational allegations may be grist for the mill of business journalists, but a Court

cannot declare a grant of executive compensation to be excessive without immediately inviting

the subsequent question: 'How much is too much?' The answer to that question depends greatly

upon context." *In re Infousa,* 2007 WL 3325920, at *12. Without pointing to evidence indicating

that the amount potentially provided to Biglari under the Agreement is "unjust, oppressive, or

---

[13] Plaintiff presumably refers to Martha Stewart—despite her own rather bumpy history as a corporate figurehead— because the memorandum considered by the GCN committee in connection with its consideration of the Agreement used her licensing agreement as a sample reference. *See* Am. Compl., Ex. 3 at BH-TAYLOR-00002930–2931.

fraudulent," *cf. G & N Aircraft,* 743 N.E.2d at 239, it is not appropriate for us to question the board's implicit statement of the value that Biglari's services as CEO provide to the company. *See In re Walt Disney,* 731 A.2d at 362–363.

"Risk is inherent in almost every business decision, and the ability to weigh that risk against the potential for reward sans the apprehension of hindsight bias is central to the protection that the business judgment rule affords corporate decisionmakers." *Protas v. Cavanagh,* 2012 WL 158069, at * 44, * 46 (Del. Ch. May 4, 2012). The Licensing Agreement lies well outside the narrow zone in which we disturb that protection.

## B. The BCC sale

Plaintiff contends that by selling BCC back to Biglari for $1.7 million, despite having previously purchased BCC from him for about $4.2 Million, BH's board did not achieve the "best possible result for the company." In particular, Plaintiff leans on an outside valuation analysis concluding that BCC's fair value was between $8.8 and $10.2 Million. Am. Compl. ¶¶ 83, 87. Defendants retort that the variation between the outside estimate and the final sale price can be explained by two considerations not taken into account by the outside valuation analysis. First, BCC had distributed to the company, prior to being sold back to Biglari, "substantially all of BCC's partnership interests in the Lion Fund (including, without limitation, BCC's adjusted capital balance in its capacity as general partner of the Lion Fund, which totaled approximately $5.8 million)" and "retained solely a $100,000 general partner interest in the Lion Fund" at the time of its sale. Defs.' Br. 17 (citing Clark Decl., Ex. 8 (BH Form 8-K, July 2, 2013)).[14] Second,

---

[14] We may take judicial notice of public filings like BH's Form 8–K in considering a motion to dismiss. *See Desimone v. Barrows,* 924 A.2d 908, 928 n.59 (Del. Ch. 2007) (citing *In re Gen. Motors (Hughes) S'holder Litig.,* 897 A.2d 162, 170 (Del. 2006)).

the valuation did not take into account the effect of the sale on "any obligation that BH [had] to pay an incentive bonus to [Biglari] based on the increase in value attributable to BCC and/or [The Lion Fund]." Am. Compl., Ex. 9. According to Defendants, the GCN properly took these two considerations into account in setting the price of the sale of BCC to Biglari—and in fact, BH netted a $1.6 million profit from the transaction, relative to its original purchase of BCC three years earlier. Defs.' Br. 17.[15]

Regardless of whether we agree with Defendants that the sale of BCC was a good bargain for the company, Plaintiff has raised no challenges to the transaction's procedural or substantive fairness that rebut the presumption of acceptable business judgment. With regard to the GCN's procedural duty of care, Plaintiff's only objection is to the committee's purported disregard of the outside valuation firm's appraisal of BCC's value. It is certainly true that evidence of reliance on outside experts is an indicium of a board's procedural due care, *see In re Del Monte Foods Co. S'holders Litig.*, 25 A.3d 813, 831 (Del. Ch. 2011) ("In evaluating the adequacy of the directors' decision-making and the information they had available, a reviewing court necessarily will consider the extent to which a board has relied on expert advisors."). However, the evidence cited by Plaintiff (a letter from GCN Committee member Cooper explaining the committee's rationale) tends to show that the GCN Committee did, in fact, take the outside valuation into account—using it as a starting point for the adjustments described above. *See* Am. Compl., Ex. 9. In the absence of any additional allegations that the committee or board ignored relevant data

---

[15] Regarding Plaintiff's further allegation that BH's heavy investments in the Lion Fund II will enable Biglari to use those funds for his own personal benefit, "just as he has in the past," Am. Compl. ¶ 85, Defendants answer that BH—not Biglari himself—owns almost all of the Lion Fund II. *See* Clark Decl., Ex. 15 (Form 10-Q, Aug. 9, 2013). We agree with Defendants that the allegation that Biglari can use the funds BH has invested in the Lion Fund II as a personal piggy bank is baseless and speculative. Plaintiff's citation to a case evaluating an entrenchment plan according to heightened scrutiny, *In re Fuqua Indus., Inc. S'holder Litig.*, 1997 WL 257460, at *11 (Del. Ch. May 13, 1997), is inapposite.

or that their stated reasons for adjusting the outside evaluation amount were irrational, we conclude that this allegation is insufficient to create reasonable doubt as to due care. *See Ash,* 2000 WL 1370341, at *10.[16]

Plaintiff also contends that the BCC sale, or what it characterizes more broadly as the "BCC round trip," was actionably defective as a matter of substance—that it was "so fatally flawed that it can only be explained by bad faith." Pl.' Resp. 29 (citing *Citron v. Fairchild Camera & Instrument Corp.*, 569 A.2d 53, 64 (Del. 1989)). But Plaintiff makes no other factual allegations to substantiate this conclusory assertion. BH's SEC filing in connection with the sale offered the following rationales for the transaction: to "(a) reduce regulatory burdens related to investments, (b) improve cash management, (c) foster an enhanced understanding of BH and mitigate conflicts of interest through the separation and clear demarcation of BH from the Lion Fund, and (d) simplify the Incentive Bonus Agreement." Clark Decl., Ex. 13 (July 19, 2013 Form S-3/A) at 21. Plaintiff never rebuts these stated justifications, to which we therefore defer. As we have noted, a transaction is not corporate waste where a company receives *any* substantial consideration: "If Company A exchanges $100 for an asset from Company B that Company A believes is worth $100, it is not 'waste' if it later turns out that Company B's asset was worth only $10." *Ash,* 2000 WL 1370341, at *8. Here, BH concededly received money in exchange for the sale, in addition to the other benefits it claims to have derived from the transaction. That is enough to defeat a demand futility claim for waste. *See White,* at 783 A.2d at 554 (Del. 2001).

---

[16] Plaintiff cites *Iseman v. Liquid Air Corp.*, 1989 WL 125234 (Del Ch. Oct. 23, 1989), in support of its argument that Defendants violated their duty of procedural due care. *Iseman,* like a great number of other cases cited by Plaintiff in its briefing, is irrelevant because it applied a far more rigorous "entire fairness" standard to the defendant board's actions. 1989 WL 125234, at *1045–1047.

*Cf. Green,* 1996 WL 342093, at *8 (denying motion to dismiss where transaction did not identify any consideration at all received by the company).

## C. Rights Offering

Plaintiff challenges the Rights Offering primarily on procedural grounds: "Although Defendants argue that they engaged in a deliberate process, the evidence demonstrates that they acted in a reckless and wholly uninformed manner." Pl.'s Resp. 31. The only evidence Plaintiff cites in support of this contention is the fact that BH "did not employ a financial advisor in connection with the Rights Offering, even though it raised more than $75 million and industry custom is to hire a financial adviser for offerings that are even a fraction of this size." Pl.'s Resp. 9 (citing Am. Compl. ¶ 93).[17] As we have previously noted, a board's use of an outside advisor—though it may help inoculate their decision-making against criticism—is not a prerequisite for an informed business judgment. *See Van Gorkom,* 488 A.2d at 876 ("We do not imply that an outside valuation study is essential to support an informed business judgment, nor do we state that fairness opinions by independent investment bankers are required as a matter of law."). Without any particularized allegation that the directors ignored relevant considerations or reached their decision based on inadequate deliberation[18], the business judgment rule leaves us to presume that the board members agreed to the Rights Offering on other bases than the advice of an outside financial advisor. *See Lewis v. Honeywell, Inc.,* 1987 WL 14747, at *13 (Del. Ch. July 28, 1987) (affirming that the lack of an outside advisor "by itself is legally insufficient" to rebut

---

[17] Plaintiff offers no particularized facts to support his bare assertion as to "industry custom." Am. Compl. ¶ 93.
[18] Plaintiff objects in his Response that the January 22, 2013 board minutes, which were attached as an exhibit to Defendants' counsel's declaration in connection with the preliminary injunction motions, *see* Clark Decl., Ex. 19, do not show that any "presentation or report was reviewed or received by the Board." Pl.'s Resp. 31. This merely restates the objection that no outside advisor was employed. The contents of those board minutes remain sealed, *see* Docket No. 130, and because Plaintiff's reference to them simply duplicates another argument, we see no reason to delve into those comments.

presumption of due care, and noting that the defendant board members may have "relied on their knowledge gathered from other reliable sources").[19] *Cf. Sample,* 914 A.2d at 651 (denying motion to dismiss where reliance on company's outside counsel was one of several procedural "red flags").

Consistent with his allegations throughout the Amended Complaint, Plaintiff also asserts that the Rights Offering was initiated for an improper entrenchment purpose. Am. Compl. ¶¶ 16, 100. As we have already concluded, Plaintiff's allegations are insufficient to create reasonable doubt that the board members violated their fiduciary duty of loyalty and engaged in self-interested actions for the purpose of perpetuating themselves in office. *See supra,* § II(A). First, the heightened scrutiny warranted by entrenchment transactions is typically triggered only if evidence indicates the existence of a threat to directors' control against which the challenged transactions were directed. *See Grobow,* 539 A.2d at 188. Otherwise, a plaintiff faces the same formidable pleading threshold we have already described in establishing such an improper purpose. For instance, Plaintiff cites *Strassburger v. Earley,* 752 A.2d 557 (Del. Ch. 2000), for the proposition that "it is improper to cause the corporation to repurchase its stock for the sole or primary purpose of maintaining the board or management in control. In such a case the purchase is deemed unlawful even if the purchase price is fair." 752 A.2d at 772–773. While this is true enough, Plaintiff skips a step: his burden of establishing that the transaction here was taken for the "sole or primary" purpose of entrenchment. Apart from an email in which Sardar Biglari arguably expressed interest in implementing a dual-class stock structure[20] and the fact that the

---

[19] Defendants assert that just such a deliberative process did, in fact, occur: "The Board engaged in a deliberative process that included consultations with outside attorneys and a discussion of the benefits to the Company for raising capital using a rights offering versus other alternatives that could be available to BH." Defs.' Br. 19 (citing Clark Decl. Ex. 19 at 4). We consider only the adequacy of Plaintiff's pleading in ruling on this motion, however.

[20] The Amended Complaint states that after receiving email notification of the Form S-3 filing regarding the Rights Offering, Biglari responded: "Did you find out if we can pass dual class and not immediately issue dividend?" Am.

Rights Offering marginally increased Biglari's ownership share from 15.4% to 16.1%, Am. Compl. ¶ 95, Plaintiff has advanced no allegations casting into doubt the board's stated goal of raising capital—a goal which the Rights Offering apparently met by drawing $75 million in new funds. *See* Defs.' Br. 19. Plaintiff's argument for demand futility with regard to the Rights Offering is therefore groundless as well. *See Green,* 1996 WL 342093, at *4.

## Conclusion

Plaintiff's failure to make demand on the BH board means that his derivative claims must be dismissed unless he can satisfy the *Aronson* test for demand futility as borrowed from Delaware by Indiana law. Because none of Plaintiff's claims pass the *Aronson* test, Defendants' motion to dismiss on the basis of failure to make demand is accordingly GRANTED.[21] Judgment in this consolidated action shall enter in favor of Defendants.

IT IS SO ORDERED.

03/18/2015

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

---

Compl. ¶ 91. We do not see any reason to infer from the fact that Biglari was interested in a dual-class stock structure that the Rights Offering was primarily or solely an entrenchment device.

[21] Count III of the Amended Complaint, seeking contribution and indemnification, fails where all of Plaintiff's other claims are subject to dismissal. *See Factory Mut. Ins. Co. v. Bobst Grp. USA, Inc.*, 392 F.3d 922, 924 (7th Cir. 2004) ("Contribution, like indemnity, is impossible without some underlying liability.").

Distribution:

Christopher J. Clark
ADAMS, HAWWARD, NICOLAS & WELSH
christopher.clark2@lw.com

Louis Nathaniel Boyarsky
GLANCY BINKOW & GOLDBERG LLP
lboyarsky@glancylaw.com

Offer Korin
KATZ & KORIN P.C.
okorin@katzkorin.com

Debra Ann Mastrian
KRIEG DEVAULT LLP
dmastrian@kdlegal.com

Scott Stuart Morrisson
KRIEG DEVAULT LLP
smorrisson@kdlegal.com

James Christian Word
LATHAM & WATKINS, LLP
christian.word@lw.com

Adam Poncio
PONCIO LAW OFFICES PC
5410 Fredericksburg Road, Suite 109
San Antonio, TX 78229-3550

Brian J. Robbins
ROBBINS ARROYO LLP
notice@robbinsarroyo.com

Joan M. Rabutaso
ROBBINS ARROYO LLP
jrabutaso@robbinsarroyo.com

Kevin A. Seely
ROBBINS ARROYO LLP
kseely@robbinsarroyo.com

Leonid  Kandinov
ROBBINS ARROYO LLP
lkandinov@robbinsarroyo.com

Avraham Noam Wagner
THE WAGNER FIRM
avi@thewagnerfirm.com